ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 8, 2016

No. 16-05196

## IN THE UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT

LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEAGUE OF WOMEN VOTERS OF ALABAMA, LEAGUE OF WOMEN VOTERS OF GEORGIA, LEAGUE OF WOMEN VOTERS OF KANSAS, GEORGIA STATE CONFERENCE OF THE NAACP, GEORGIA COALITION FOR THE PEOPLE'S AGENDA, MARVIN BROWN, JOANN BROWN, and PROJECT VOTE

Plaintiffs-Appellants

v.

BRIAN D. NEWBY, in his capacity as the Executive Director of The United States Election Assistance Commission; and THE UNITED STATES ELECTION ASSISTANCE COMMISSION

Defendant-Appellees

and

KANSAS SECRETARY OF STATE KRIS W. KOBACH and PUBLIC INTEREST LEGAL FOUNDATION

Defendant-Intervenors

*On Appeal from the United States District Court for the District of Columbia*
Case No. 16-cv-236(RJL)

### BRIEF OF APPELLANTS

Jonathan D. Janow
D.C. Bar No. 1002399
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW, Suite 1200
Washington, DC  20005
(202) 879-5000

*Counsel for Plaintiffs-Appellants the League of Women Voters of the United States, the League of Women Voters of Kansas, the League of Women Voters of Alabama, and the League of Women Voters of Georgia*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Rules 28(a)(1), undersigned counsel for Appellants hereby provide the following information:

## I. PARTIES AND *AMICI* APPEARING BELOW

The parties and *amici* who appeared before the U.S. district court were:

1.   League of Women Voters of the United States, League of Women Voters of Alabama, League of Women Voters of Georgia, League of Women Voters of Kansas, Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Marvin Brown, JoAnn Brown, and Project Vote, *Appellants*

2.   Brian D. Newby, in his capacity as the Executive Director of The United States Election Assistance Commission, and the United States Election Assistance Commission, *Defendants*

3.   Kansas Secretary of State Kris W. Kobach, and Public Interest Legal Foundation, *Defendant-Intervenors*

4.   Landmark Legal Foundation, *Amicus Curiae*

## II. PARTIES AND *AMICI* APPEARING IN THIS COURT

1.   League of Women Voters of the United States, League of Women Voters of Alabama, League of Women Voters of Georgia, League of Women Voters of Kansas, Georgia State Conference of the NAACP,

Georgia Coalition for the People's Agenda, Marvin Brown, JoAnn Brown, and Project Vote, *Appellants*

## III.  RULINGS UNDER REVIEW

The ruling under review in this case is United States district court Judge Richard J. Leon's June 29, 2016 Order and Memorandum denying Appellants' motion for a preliminary injunction.

## IV.  RELATED CASES

This case has not previously been filed with this court or any other court. Counsel are aware of no cases that meet this Court's definition of related.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF ABBREVIATIONS .................................................ix

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ......................................................5

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................5

STATEMENT OF THE CASE...............................................................6

    A.    Origins of the Federal Form ...............................................6

    B.    Arizona's EAC Requests and the Supreme Court's *ITCA* Decision.................................................................................10

    C.    The Tenth Circuit Holds that the EAC's Denial of States' Requests was Permissible..................................................12

    D.    Authority of the EAC Executive Director............................14

    E.    The EAC's Quorum is Restored..........................................16

    F.    Brian Newby is Appointed as Executive Director of the EAC...........18

    G.    The Executive Director Unilaterally Grants Requests by Alabama, Georgia and Kansas to Require Documentary Proof of Citizenship ...................................................................19

    H.    The EAC's Action Has Caused Immediate and Irreparable Harm ...................................................................................22

    I.    Procedural History...............................................................24

SUMMARY OF THE ARGUMENT ....................................................27

ARGUMENT .......................................................................................28

    A.    Appellants Demonstrate A Substantial Likelihood of Success on the Merits.......................................................................31

        1.    The Executive Director Acted Contrary to Law by Unilaterally Changing Longstanding EAC Policy Without the Statutorily Required Approval of Three Commissioners.........................................................31

i

2.      The EAC Failed to Provide a Formal Notice and Comment Period as Required by the Administrative Procedure Act ...................................................... 34

3.      The EAC Did Not Articulate Any Rationale for its Reversal of Policy and Precedent ............................................. 36

4.      The EAC's Decision Exceeds Its Statutory Authority Under the NVRA ..................................................... 38

5.      The Executive Director Failed to Follow the EAC's Own Internal Procedures and Guidelines .......................................... 41

B.    Appellants Have Suffered Irreparable Harm Due to the Executive Director's Decision ........................................................... 44

1.      Citizens (including Appellants' members and those they assist) are unable to register to vote or face significant burdens ................................................................................. 46

2.      Appellants' voter registration efforts are impeded .................. 50

3.      Appellants have been forced to expend and divert money and other resources to comply with the new requirements ....... 54

C.    There is No Possibility of Harm to Other Parties if Relief is Granted ................................................................................ 56

D.    There is a Strong Public Interest in Granting Appellants' Motion ................................................................................. 58

CONCLUSION .................................................................................. 60

# TABLE OF AUTHORITIES

## Cases

*Action for Children's Television v. FCC,*
  821 F.2d 741 (D.C. Cir. 1987) ............................................................ 36, 37, 41

*AFL-CIO v. Donovan,*
  757 F.3d 330 (D.C. Cir. 1985) ..........................................................34

*Aid Ass'n for Lutherans v. U.S. Postal Serv.,*
  321 F.3d 1166 (D.C. Cir. 2003) ..........................................................41

*Am. Coke & Coal Chems. Inst. v. EPA,*
  452 F.3d 930 (D.C. Cir. 2006) ..........................................................38

*Arizona v. The Inter Tribal Council of Ariz.,*
  133 S. Ct. 2247 (2013) ........................................ 3, 4, 6, 10, 11, 12, 14, 21, 41, 59

*Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.,*
  269 F.3d 1112 (D.C. Cir. 2001) ..........................................................38

*Baumann v. D.C.,*
  655 F. Supp. 2d 1 (D.D.C. 2009) ..........................................................58

*Beaty v. FDA,*
  853 F. Supp. 2d 30 (D.D.C. 2012)
  *aff'd in part, vacated in part sub nom.*
  *Cook v. FDA,* 733 F.3d 1 (D.C. Cir. 2013) ..........................................................40

*Black v. Snow,*
  272 F. Supp. 2d 21 (D.D.C. 2003),
  *aff'd sub. nom. Black v. Ashcroft,* 110 F. App'x 130 (D.C. Cir. 2004) ..............43

*Camp v. Pitts,*
  411 U.S. 138 (1973) ..........................................................38

*Carey v. FEC,*
  791 F. Supp. 2d 121 (D.D.C. 2011) ..........................................................29

*Chamber of Commerce v. U.S. Dep't of Labor,*
  174 F.3d 206 (D.C. Cir. 1999) ..........................................................34

*Authorities upon which we chiefly rely are marked with asterisks.

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ...................................................... 29, 56

*Comcast Corp. v. FCC,*
  526 F.3d 763 (D.C. Cir. 2008) ...................................................... 37, 38

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) .................................................... 30, 44

*\*Dep't of the Army v. Blue Fox, Inc.,*
  525 U.S. 255 (1999) ......................................................................56

*Eagle Broad. Grp., Ltd. v. FCC,*
  563 F.3d 543 (D.C. Cir. 2009) ......................................................37

*FCC v. Fox Television Stations,*
  556 U.S. 502 (2009) ......................................................................36

*Fish v. Kobach,*
  -- F. Supp. 3d --, 2016 WL 2866195 (D. Kan. May 17, 2016) .................... 50, 57

*Fort Stewart Schs. v. Fed. Labor Relations Auth.,*
  495 U.S. 641 (1990) ......................................................................42

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal,*
  546 U.S. 418 (2006) ......................................................................56

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous.
  & Urban Dev.,*
  639 F.3d 1078 (D.C. Cir. 2011) ......................................................29

*Hamdan v. Rumsfeld,*
  548 U.S. 557 (2006) ......................................................................40

*IMS, P.C. v. Alvarez,*
  129 F.3d 618 (D.C. Cir. 1997) ......................................................43

*INS v. Yang,*
  519 U.S. 26 (1996) ........................................................................36

*Iowa Utils. Bd. v. FCC,*
  109 F.3d 418 (8th Cir. 1996).........................................................55

*Kobach v. U.S. Election Assistance Comm'n*,
  135 S. Ct. 2891 (2015) ................................................................. 13, 14

\*Kobach v. U.S. Election Assistance Comm'n*,
  772 F.3d 1183 (10th Cir. 2014),
  *cert. denied* 135 S. Ct. 2891 (2015) ............................... 13, 14, 15, 21, 32, 35, 37

*Kobach v. U.S. Election Assistance Comm'n*,
  No. 13-CV-4095-EFM-DJW,
  2013 WL 6511874 (D. Kan. Dec. 12, 2013) ......................... 12, 32, 43

\*League of Women Voters of Fla. v. Browning*,
  863 F. Supp. 2d 1155 (N.D. Fla. 2012) ........................................ 45, 49

\*League of Women Voters of N.C. v. N.C.*,
  769 F.3d 224 (4th Cir. 2014) ........................................... 45, 46, 49, 58

*Mazaleski v. Treusdell*,
  562 F.2d 701 (D.C. Cir. 1977) .......................................................... 44

\*Mills v. D.C.*,
  571 F.3d 1304 (D.C. Cir. 2009) ................................................. 29, 44

\*Motor Vehicle Mfrs. Ass'n of The U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................... 36

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,
  979 F.2d 227 (D.C. Cir. 1992) ......................................................... 34

\*Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*,
  404 F.3d 454 (D.C. Cir. 2005) .................................................... 37, 38

\*New Process Steel, L.P. v. NLRB*,
  560 U.S. 674 (2010) ......................................................................... 33

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
  477 F.3d 668 (9th Cir. 2007) ........................................................... 36

\*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ..................................................... 45, 57

\*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ..................................................................... 34

*Project Vote v. Blackwell,
    455 F. Supp. 2d 694 (N.D. Ohio 2006) .................................................45

Pub. Citizen, Inc. v. Mineta,
    427 F. Supp. 2d 7 (D.D.C. 2006) ........................................................34

Robles v. Kerry,
    74 F. Supp. 3d 254 (D.D.C. 2014) ......................................................56

*Smoking Everywhere, Inc. v. USDA,
    680 F. Supp. 2d 62 (D.D.C. 2010) ......................................................56

Steenholdt v. FAA,
    314 F.3d 633 (D.C. Cir. 2003) ...........................................................43

Texas Children's Hosp. v. Burwell,
    76 F. Supp. 3d 224 (D.D.C. 2014) ......................................................57

The Way of Life Television Network, Inc. v. FCC,
    593 F.2d 1356 (D.C. Cir. 1979) .........................................................42

*Util. Solid Waste Activities Grp. v. EPA,
    236 F.3d 749 (D.C. Cir. 2001) ...........................................................34

VanderMolen v. Stetson,
    571 F.2d 617 (D.C. Cir. 1977) ...........................................................42

Veasey v. Abbott,
    136 S. Ct. 1823 (2016) .....................................................................26

*Wash. Ass'n of Churches v. Reed,
    492 F. Supp. 2d 1264 (W.D. Wash. 2006) .........................................45

Wis. Gas Co. v. FERC,
    758 F.2d 669 (D.C. Cir. 1985),
    aff'd in part, remanded in part
    770 F.2d 1144 (D.C. Cir. 1985) .........................................................55

## Statutes

28 U.S.C. § 1292(a)(1).............................................................................5

28 U.S.C. § 1331 ....................................................................................5

42 U.S.C. § 15328 ................................................................17

5 U.S.C. § 553 ...................................................................34

5 U.S.C. § 702 ...................................................................56

*5 U.S.C. § 706(2)(C) ...................................................... 33, 41

52 U.S.C. § 20501 ................................................................1

52 U.S.C. § 20501(b) ...........................................................59

*52 U.S.C. § 20501(b)(1) .................................................. 6, 58

52 U.S.C. § 20501(b)(3) .........................................................6

52 U.S.C. § 20503 ................................................................7

52 U.S.C. § 20505 ................................................................7

52 U.S.C. § 20505(a)(1) .........................................................6

52 U.S.C. § 20505(b) .............................................................7

52 U.S.C. § 20508 ...............................................................32

52 U.S.C. § 20508(a) .............................................................7

*52 U.S.C. § 20508(b)(1) ........................................ 8, 11, 21, 39, 40, 41

52 U.S.C. § 20508(b)(2) .........................................................39

52 U.S.C. § 20901 ...............................................................24

52 U.S.C. § 20921 ................................................................7

52 U.S.C. § 20923(a)(2) .........................................................32

*52 U.S.C. § 20928 ........................................................ 10, 14, 32

52 U.S.C. § 20929 ................................................................7

52 U.S.C. § 21083(b)(4)(A) .....................................................39

**Rules**

Fed. R. Civ. P. 65 ...................................................................................................5

**Other Authorities**

11 C.F.R. § 9428.4 ........................................................................... 9, 10

11 C.F.R. § 9428.4(b)(1)-(3) ...................................................................9

*139 Cong. Rec. 5098 (1993) ............................................................ 7, 43

139 Cong. Rec. 9231 (1993) ...................................................................7

58 Fed. Reg. 51,132 (Sept. 30, 1993) ........................................... 8, 34, 37

59 Fed. Reg. 11,211 (Mar. 10, 1994) ............................................ 8, 34, 37

59 Fed. Reg. 32,311 (June 23, 1994) .................................................. 8, 10

59 Fed. Reg. 32,316 ...........................................................................10

KAN. ADMIN. REGS. § 7-23-15 (2016) ............................................ 24, 53

KAN. STAT. ANN. § 19-3419 (2016) .......................................................19

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Commission | U.S. Election Assistance Commission |
| Commissioner(s) | Commissioner(s) of the U.S. Election Assistance Commission |
| Conf. Rep. | H.R. Conference Report No. 103-66 (1993) |
| DOJ | Department of Justice |
| EAC | U.S. Election Assistance Commission |
| Executive Director | Executive Director of the U.S. Election Assistance Commission |
| FEC | Federal Election Commission |
| Federal Form | Mail-in Voter Registration Form |
| HAVA | Help America Vote Act |
| *ITCA* | Decision in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013) |
| JA- | Citation to the Joint Appendix |
| League | League of Women Voters of the United States, League of Women Voters of Alabama, League of Women Voters of Georgia,  and League of Women Voters of Kansas |
| NVRA | National Voter Registration Act of 1993 |
| SA- | Citation to the Sealed Appendix |

## INTRODUCTION

This appeal is about the ability of civic groups to register eligible voters—and eligible citizens to be timely registered--in three states in time for the upcoming presidential federal elections.

On January 29, Brian Newby, the Executive Director of the U.S. Election Assistance Commission (the "Commission" or "EAC") unilaterally modified the uniform mail-in voter registration form ("Federal Form") prescribed by the National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq.* ("NVRA").

Every day, eligible voters in three states are being prevented from registering to vote—and civic groups are being prevented from conducting effective voter registration drives—because of the unauthorized decision of a single federal agency official. In Alabama, Georgia, and Kansas, voters are now instructed that in order to register to vote using the federal government's registration form, they must provide documentation proving their United States citizenship. Many people in those states do not have the required documents. Obtaining them would be burdensome and costly—or outright impossible. This requirement, which has been expressly and repeatedly rejected by Congress and the federal agencies that manage the Federal Form, only came into effect because an agency official grossly exceeded the bounds of his limited authority. His decision circumvented a deliberately bipartisan decision-making process to achieve

harmful ends during the critical registration period preceding the federal presidential election.

The EAC was created as a bipartisan commission, to be run by two Democratic and two Republican Commissioners. Recognizing the importance of bipartisan consensus in the critical realm of election administration, Congress designed the EAC's enabling statute to require the approval of at least three Commissioners—ensuring that no action could be taken without agreement from both major political parties.

It is undisputed here that the Commissioners did not vote to take or otherwise approve the action that the Executive Director decided on January 29. It is also undisputed that the Commission had decided to reject such action on numerous occasions over several years—a policy decision that the Executive Director reversed on January 29. And while the Commission had previously, in a written policy adopted by a formal vote, specifically delegated limited authority to its Executive Director to maintain the Federal Form consistent with agency policy and precedent, it is undisputed that the Commission had, in an express written policy adopted by a formal vote before Mr. Newby was appointed, rescinded that limited delegation of authority. Finally, it is undisputed – and conceded by Appellee – that, whatever authority the Executive Director had, he did not properly exercise it in accordance with the governing statutory standards. In particular, Mr.

Newby acted without making the determination that proof of citizenship was "necessary to enforce [the States'] voter qualifications," as the Supreme Court said was required before adding additional requirements on the Federal Form, *Arizona v. The Inter Tribal Council of Ariz.*, 133 S. Ct. 2247, 2255 (2013) ("*ITCA*").

Despite Appellants' overwhelming probability of success on the merits, the district court, after almost four long months, denied Appellants' motion for a preliminary injunction without at all addressing the merits of Plaintiffs' case. Rather, it focused solely on Appellants' claims of irreparable injury, alternately trivializing them, distorting them, ignoring them, and ultimately dismissing them. The claim that thousands of Kansas citizens would fail to register because of the unlawful documentation requirements was dismissed on the basis of Intervenors' naked – and inaccurate – assertion that these voters could be "retroactively" registered at any time. The claim that the organizational Appellants were being forced to continuously divert resources to ameliorate the problems caused by Executive Director's unlawful act was characterized as a claim that the organizations could not carry out their mission at all – a claim that was never made. The claim that voters in Alabama and Georgia would be confused because those states had not implemented the new unlawful requirement, but were telling their voters that they were subject to the requirement, was not addressed. And the claim that the Appellant organizations would have to spend time educating voters

as to the requirements was met with this: "Let's be candid: doing so pales in comparison to explaining to the average citizen how the ACA or tax code works!" Appellants are aware of no other case in which a court has found no irreparable harm from a law or policy making it harder to register to vote before an election.

Mr. Newby's unlawful action has prevented and continues to prevent voters across three states from registering in a crucial presidential election year. Tens of thousands of eligible citizens in Kansas have already been denied the right to register, and will be deprived of their fundamental right to vote in the upcoming federal elections, because they lack access to their citizenship documents. And even though Alabama and Georgia are not yet enforcing the citizenship documentation requirement, that is of little benefit to the voters in those states who consult the amended instructions to the Federal Form and are instructed that they cannot register without proof of citizenship, discouraging those without documents from ever attempting to register. Mr. Newby's action undermines the core function of the Federal Form, which is supposed to "provide[] a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." *ITCA*, 133 S. Ct. at 2255. In so doing, it undermines the Federal Form's purpose of "increasing the number of eligible citizens who register to vote." *Id.* at 2256.

4

Moreover, in all three states, the change made by Mr. Newby is interfering with Appellants' ability to conduct voter registration drives and is causing them to divert resources away from their core mission activities.

A full analysis of Appellants' request for preliminary injunctive relief shows that such relief is wholly warranted in order for appropriate relief to be issued in time for voters to register for the November election.

Therefore, the judgment of the district court should be reversed, and this Court should grant Appellants' motion for a preliminary injunction.

## JURISDICTIONAL STATEMENT

Appellants filed a motion for a temporary restraining order and preliminary injunction in the United States District Court for the District of Columbia pursuant to Fed. R. Civ. P. 65.  The district court had jurisdiction under 28 U.S.C. § 1331.  This Court has jurisdiction to review the district court's decision denying a preliminary injunction.  28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred in denying Appellants' motion for a preliminary injunction seeking to enjoin the Executive Director's unauthorized decision to permit Alabama, Georgia, and Kansas to require documentary proof of citizenship from new voter registrants on the Federal Form —without the approval of three commissioners and in contravention of two decades of agency policy and

informal adjudications, without reason, rationale, written decision, and without making the required statutory finding of necessity.

## STATEMENT OF THE CASE

### A.      Origins of the Federal Form

Congress enacted the National Voter Registration Act principally to "increase the number of eligible citizens who register to vote in elections for Federal office."  52 U.S.C. § 20501(b)(1).  By creating the Federal Form, a single registration form that "[e]ach State shall accept and use," *id.* § 20505(a)(1), Congress sought to ensure that states could not disenfranchise voters by setting discriminatory or burdensome registration requirements.  *See ITCA*, 133 S. Ct. 2247 at 2255.  Congress also recognized the need to protect the "integrity of the electoral process."  52 U.S.C. § 20501(b)(3).  Both Houses of Congress debated and voted on the specific question of whether to permit states to require documentary proof of citizenship in connection with the Federal Form, and ultimately rejected such a proposal.  *See* S. Rep. No. 103-6 (1993); 139 Cong. Rec. 5098 (1993); H.R. Rep. No. 103-66, at 23 (1993) ("Conf. Rep."); 139 Cong. Rec. 9231-32 (1993).  In particular, the final Conference Committee Report concluded that such a provision was "not necessary or consistent with the purposes of this Act" and "could be interpreted by States to permit registration requirements that

could effectively eliminate, or seriously interfere with, the [Act's] mail registration program."  Conf. Rep. at 23-24.

The Federal Form was also intended to benefit voter registration organizations, such as Appellants the League, Project Vote and others, to streamline the voter registration process and mitigate varying and confusing state registration laws.  *See* 52 U.S.C. § 20505(b) (mandating that state officials make the Federal Form available to "governmental and private entities, with particular emphasis on making them available for organized voter registration programs").  Central to Congress's efforts was the agreement that states could not unilaterally change the Federal Form.  Rather, the development and implementation of the Federal Form was—and remains—a responsibility delegated exclusively to a federal agency.

The NVRA mandated that citizens of any covered state could use the Federal Form to register for federal elections.[1]  *Id.* § 20505.  The EAC's predecessor agency, the Federal Election Commission ("FEC"),[2] developed the

---

[1] The NVRA applies to 44 states. Six states are exempt because they have either no voter registration requirement or continuously offered same day voter registration at the polls since 1994.  *See* 52 U.S.C. § 20503.

[2] When the NVRA was originally passed, the agency responsible for implementing the NVRA was the FEC.  The Help America Vote Act ("HAVA") later created the EAC and transferred to the EAC the responsibility of prescribing regulations necessary for a mailvoter registration form for elections for Federal office.  *See* 52 U.S.C. §§ 20508(a), 20921, 20929.

7

initial Federal Form through an extensive notice and comment rulemaking process. *See* 58 Fed. Reg. 51,132 (Sept. 30, 1993) (Advance Notice of Proposed Rulemaking); 59 Fed. Reg. 11,211 (Mar. 10, 1994) (Notice of Proposed Rulemaking); 59 Fed. Reg. 32,311 (June 23, 1994) (Final Rules). Importantly, the NVRA mandated that the Federal Form require "only such identifying information . . . as is *necessary* to enable the appropriate State official to assess the eligibility of the applicant." 52 U.S.C. § 20508(b)(1) (emphasis added).

The Federal Form is formatted as a postcard that the applicant can simply fill out and mail in. The contents of the Form are governed by 11 C.F.R. § 9428.4(b)(1)-(3), which specifies the precise information that the Federal Form can request from an applicant. Pursuant to those duly enacted regulations, the Federal Form has safeguards to prevent non-citizen registration, including an attestation clause that sets out the requirements for voter eligibility, a provision requiring registrants to confirm U.S. citizenship under penalty of perjury, and a provision imposing criminal penalties on persons who knowingly and willfully engage in fraudulent registration practices. In addition, applicants must check a box at the top of the form to affirm U.S. citizenship, and are clearly directed at several points in the instructions and on the postcard itself not to complete the form if they are not citizens. The Federal Form further requires the applicant to sign the bottom of the form and swear or affirm under penalty of perjury that he

8

or she is a U.S. citizen and further that, "[i]f I have provided false information, I

may be fined, imprisoned, or (if not a U.S. citizen) deported from or refused entry

to the United States." *E.g.*, JA-798.

Consistent with Congress's rejection of such a requirement, the Federal

Form was adopted without any requirement for documentary proof of citizenship.

*See* 11 C.F.R. § 9428.4; NVRA, 59 Fed. Reg. 32,311 (June 23, 1994). During the

course of the rulemaking, no state suggested that documentary proof might be

"necessary" under the NVRA, and the FEC did not address the issue. Addressing

whether to require information regarding naturalization, the agency determined

that "[t]he issue of U.S. citizenship is addressed within the oath required by the Act

and signed by the applicant under penalty of perjury. To further emphasize this

prerequisite to the applicant, the words 'For U.S. Citizens Only' will appear in

prominent type on the front cover of the national mail voter registration form." 59

Fed. Reg. at 32,316.

To ensure that applicants "receiv[e] the information needed to correctly

complete the [Federal Form] and attest their eligibility," *id.* at 32,317, the Form

includes instructions as to each state's voter eligibility requirements and

instructions for filling out the fields on the form. *See* 11 C.F.R. § 9428.4. Even

prior to the Executive Director's action in this case, a U.S. citizenship requirement

was additionally listed in the state-specific instructions for several states, including

Alabama, Arizona, Georgia and Kansas.  *See* JA-110-11, 13, 15.  The instructions did not mention documentary proof of citizenship.

### B.     Arizona's EAC Requests and the Supreme Court's *ITCA* Decision

In 2006, Arizona requested that the EAC modify Arizona's state-specific instructions to the Federal Form to reflect new state legislation that required documentary proof of citizenship for voter registration.  On March 6, 2006, after consideration by a quorum of Commissioners, the Executive Director sent a letter on behalf of the agency denying Arizona's request, noting that the Commission had concluded that inclusion of a documentary proof requirement would violate the NVRA, and that Arizona must "accept and use" the Federal Form without imposing additional burdens.  Nonetheless, Arizona continued to reject Federal Form applicants who did not present proof of citizenship, and submitted a request for reconsideration.  In July 2006, the EAC again considered the question and voted on whether to reverse course and modify the Federal Form pursuant to Arizona's request.  The measure failed by a 2-2 vote, having not received approval of three members of the Commission as required by law for the EAC to take any action.  *See* JA-129; 52 U.S.C. § 20928.  As Commissioner Ray Martinez III explained, the EAC had "established its own interpretive precedent regarding the use and acceptance of the Federal Form [and] upheld established precedent from [the FEC]."  *See* JA-1044.  Under this precedent, the "'language of NVRA

10

mandates that the Federal Form, without supplementation, be accepted and used by states to add an individual to its registration rolls.'"  JA-1044.

Rather than challenge the EAC's rejection of its request under the Administrative Procedure Act ("APA"), Arizona continued to require proof of citizenship from Federal Form applicants, prompting the lawsuit that resulted in the Supreme Court's decision in *ITCA*.  In *ITCA*, the Supreme Court held that Arizona's documentary proof of citizenship requirement was preempted by the NVRA with respect to applicants using the Federal Form.  133 S. Ct. at 2250.  The decision noted that the NVRA required the EAC to include in the form "only such identifying information . . . as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant," 52 U.S.C. § 20508(b)(1) (emphasis added).  The Supreme Court agreed that the NVRA requires all states to "accept and use" the "Federal Form," which, as developed and approved by the EAC, did not require documentary proof of citizenship.  *ITCA*, 133 S. Ct. at 2252-60.  As Justice Scalia, writing for the Court explained, "[n]o matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available."  *Id.* at 2255.  The *ITCA* Court further found that the NVRA's "accept and use" requirement is a constitutional exercise of Congress' power under the Elections Clause, and preempts state regulations governing the "Times, Places and Manner"

11

of holding federal elections.  *Id.* at 2253.  Accordingly, states may only add a documentary proof of citizenship requirement to the Federal Form by requesting that the EAC alter the Federal Form and, if necessary, "challeng[ing] the EAC's rejection of that request in a suit under the Administrative Procedure Act."  *Id*. at 2259.

### C.    The Tenth Circuit Holds that the EAC's Denial of States' Requests was Permissible

Just two days after the U.S. Supreme Court decision in *ITCA*, Arizona once again renewed its request that the EAC modify the Federal Form, and Kansas renewed a similar request it had first made in 2012.  JA-1116; JA-1055.  Georgia submitted a request of its own a month later.  JA-852-53. The Executive Director deferred all three requests because the EAC lacked a quorum of Commissioners to consider the matter.  In an effort to compel EAC action, Arizona and Kansas[3] brought suit against the agency.  The League, Project Vote, Inc., and others intervened in the action.  *See Kobach v. U.S. Election Assistance Comm'n*, No. 13-CV-4095-EFM-DJW, 2013 WL 6511874, at *5 (D. Kan. Dec. 12, 2013).  Although the EAC lacked the quorum required to change agency policy, the district court ordered the EAC to render a final agency action responding to the requests.

---

[3] This suit was brought by Kris Kobach and Ken Bennett, secretaries of state of Kansas and Arizona, respectively.  Kobach is an Appellee-Intervenor here.

12

On January 17, 2014, after a public notice and comment period, the Executive Director of the EAC, acting pursuant to a delegation of authority from the Commission discussed below, issued a thorough 46-page decision denying the pending requests of Arizona, Georgia and Kansas. Consistent with all previous determinations since the Federal Form was adopted, the EAC found that the states had failed to demonstrate that documentary proof of citizenship was "necessary" within the meaning of the NVRA. Considering the extensive record submitted in response to its request for public comment, the Executive Director found that Congress had rejected a similar requirement when deliberating over the NVRA; granting the States' requests would contravene other EAC rules; the States' requests were inconsistent with previous EAC determinations; and the requests would undermine the purposes of the NVRA by hindering voter registration and thwarting organized registration efforts. *See* JA-1089-1111.

Kansas and Arizona challenged the rejection of their requests under the APA; Georgia declined to do so. Ultimately the Tenth Circuit sustained the EAC's decision, ruling that the EAC was not obligated under either the NVRA or the Constitution to allow the requested modifications to the Federal Form. *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183 (10th Cir. 2014), *cert. denied* 135 S. Ct. 2891 (2015). The Tenth Circuit held that "permitting such state alterations threaten[s] to eviscerate the [Federal] Form's purpose of 'increasing the

13

number of eligible citizens who register to vote.'" *Id.* at 1195 (quoting *ITCA*, 133 S. Ct. at 2256).  Unless the information is "necessary to enforce [the States' voter] qualifications," the Federal Form must remain free of the State's procedural hurdles, as Congress intended. *Id.* (quoting *ITCA*, 133 S. Ct. at 2255).  Noting that the EAC had previously rejected the States' request to include documentary proof of citizenship, the court determined that "had the EAC accepted the states' requests, it would have risked arbitrariness, because [Kansas] and [Arizona] offered little evidence that was not already offered in Arizona's 2005 request, which the EAC rejected.  Changing course and acceding to their requests absent relevant new facts would conflict with the EAC's earlier decision."  *See id.* at 1198.

Arizona and Kansas filed a petition for certiorari, which was denied.  *See Kobach v. U.S. Election Assistance Comm'n*, 135 S. Ct. 2891 (2015).

### D.      Authority of the EAC Executive Director

The EAC Executive Director is a staff member appointed by the Commissioners.  HAVA, the EAC's enabling statute, provides that any action that the agency is authorized to take "may be carried out only with the approval of at least three of its members." 52 U.S.C. § 20928.  Nonetheless, with the formal approval of three or more Commissioners, the agency may grant a "limited subdelegation of decisionmaking authority" to its staff. *Kobach*, 772 F.3d at 1191.

14

Although the EAC lacked a quorum of Commissioners at the time of its 2014 decision denying the states' requests to modify the Federal Form, the Tenth Circuit concluded that under a prior delegation of authority by the Commission to the Executive Director when a quorum existed—a delegation of authority that has since been superseded, *see infra* at Part I.E— the Executive Director had authority to reject the requests of Arizona, Georgia and Kansas because they were inconsistent with the EAC's policies and then-existing procedures. *Kobach*, 772 F.3d at 1193-94.

In rejecting requests from Arizona, Georgia and Kansas to modify the Federal Form, then-EAC Executive Director Alice Miller was acting under two sources of authority: (1) prior EAC policy established through notice and comment rulemaking, and consistently maintained by votes of at least three Commissioners operating with a full quorum, and (2) an express delegation of authority from the Commissioners to apply agency policy and "maintain the [Federal Form]."  JA-1002.

This latter delegation was made in the agency's "Roles and Responsibilities Statement," dated September 12, 2008, and adopted by a quorum of EAC Commissioners.    JA-996.    The Statement delegated certain authority to the Executive Director, including the responsibility to "[i]mplement and interpret [policies, regulations, and guidance] issued by the commissioners," and to

15

"[m]anage the daily operations of EAC consistent with Federal statutes, regulations and EAC policies."   JA-1001-2.   It also authorized the Executive Director to "[m]aintain the Federal Voter Registration Form consistent with the NVRA and EAC Regulations and policies."   *Id.*   However, as the Tenth Circuit noted, "the 2008 subdelegation did not transfer the Commissioners' full power," but rather limited the Executive Director's authority to "maintaining the Federal Form *consistent with the Commissioners' past directives* unless and until those directions were countermanded."   *Kobach*, 772 F.3d at 1193-94 (emphasis added).   The EAC's previous decisions denying state requests to modify the Federal Form to require documentary proof of citizenship constituted such  "past directives."

### E.     The EAC's Quorum is Restored

On January 13, 2015, three new Commissioners were sworn into the EAC following their nomination by the President and unanimous confirmation by the U.S. Senate.   The appointment of the Commissioners, including two Republicans and one Democrat, restored the EAC's quorum for the first time since 2010.

Among the EAC's first official actions was to clarify and further restrict the Commission's previously delegated authority to the Executive Director through a new "Election Assistance Commission Organizational Management Policy Statement," which became effective February 24, 2015 ("2015 Policy Statement"). *See* JA-1013.  Among other things, the 2015 Policy Statement reiterated that

16

> Any action of the Commission authorized by HAVA requires approval of at least three of its members.  42 U.S.C. § 15328.
>
> . . . .
>
> **II.  Division of authority regarding policymaking and day-to-day operations**
>
> 1.  **The Commissioners shall make and take action in areas of policy**.  Policymaking is a determination setting an overall agency mission, goals and objectives, or *otherwise setting rules, guidance or guidelines*.  Policymakers set organizational purpose and structure, or the ends the agency seeks to achieve.  *The EAC makes policy through the formal voting process*.
>
> 2.  **The Executive Director in consultation with the Commissioners is expected to:**  (1) *prepare policy recommendations for commissioner approval*, (2) implement policies *once made*, and (3) take responsibility for administrative matters.  The Executive Director may carry out these responsibilities by delegating matters to staff.

JA-1014 (emphasis added).  The 2015 Policy Statement expressly superseded the Commission's earlier delegations of authority to the Executive Director, including the 2008 "Roles and Responsibilities Statement," *see* JA-1013 (providing that the 2015 Policy Statement supersedes 2008-2012 statements and "replaces any existing EAC policy or document that is inconsistent with its provisions").  The 2015 Statement made no reference to the Federal Form, or policy changes thereto, as being within the authority of EAC Executive Director.

17

## F.    Brian Newby is Appointed as Executive Director of the EAC

On November 2, 2015, the Commission appointed Brian Newby to serve as Executive Director.  For the 11 years prior to his appointment, Mr. Newby acted as an election official in the state of Kansas.  He was last appointed to the post of Election Commissioner of Johnson County, the largest county in Kansas, by Kansas Secretary of State Kobach, who made the request at issue in this case. KAN. STAT. ANN. § 19-3419 (2016). Mr. Newby was previously involved in Kansas's efforts to require  proof of citizenship as a condition to voter registration, including testifying in favor of implementation of the requirement and publicly commenting on his actions to help enforce the law on many occasions.  *See* JA-141-43.

In 2014, Newby submitted comments to the EAC in support of granting Kansas's 2012 request to require documentary proof of citizenship with the Federal Form.  Writing to the EAC, Newby "respectfully request[ed] that the voter registration form maintained for Kansans by the Election Assistance Commission (EAC) be modified to the full extent previously requested by the Kansas Secretary of State."  JA-147.

18

### G.     The Executive Director Unilaterally Grants Requests by Alabama, Georgia and Kansas to Require Documentary Proof of Citizenship

On or about November 17, 2015, just fifteen days after Mr. Newby's appointment as Executive Director, Kansas submitted its *fifth* request to the EAC to require documentary proof of citizenship. *See* JA-859.[4]

On December 21, 2015, Counsel for the League submitted a letter to Mr. Newby in response to Kansas's latest request. The letter reminded the EAC that it could implement new modifications to the Federal Form only through notice and comment rulemaking, that modifying the Federal Form as requested by Kansas would constitute an official EAC action requiring a vote of at least three Commissioners, and that modifying the Federal Form to allow documentary proof of citizenship would violate the NVRA, as previously affirmed by the EAC and the Tenth Circuit. *See* JA-865. Mr. Newby confirmed receipt of this letter on January 23, 2016, thirty-two days after the League's letter was submitted.

---

[4] Kansas referenced its statutory requirement of documentary proof of citizenship to register to vote, and purported to include new evidence showing noncitizens registering or voting. In fact, the evidence was of the same type already reviewed by the EAC in its January 17, 2014 decision, and included individual cases of alleged non-citizen registration that had already been submitted to the EAC. Kansas also cited its adoption of Kansas Administrative Regulation 7-23-15, which purported to interpret the state's new election code by adding a 90-day requirement to provide proof of citizenship after registering, but the request added no new substance relating to Federal Form applicants.

19

On December 24, 2015, Project Vote, through its General Counsel, submitted a letter to Mr. Newby in response to Kansas's latest request, noting that the same request had been considered and denied following a notice and comment procedure in 2014. The letter also explained that any modification to the Federal Form would require a notice and comment rulemaking procedure because it would require a revision to relevant federal regulations and would reverse a substantive position of the EAC, and that granting Kansas's request would be arbitrary and capricious and contrary to law. *See* JA-871. Mr. Newby confirmed receipt of this letter on January 23, 2016, twenty-nine days after Project Vote's letter was submitted.

On January 29, 2016, Mr. Newby issued letters to Kansas granting its request. In addition, he granted a similar request from Alabama that had been pending for over a year, and a similar request from Georgia that had already been *denied*. Mr. Newby immediately updated the EAC website instructions informing voters in Alabama, Georgia, and Kansas that they must submit documentary proof of their citizenship. *See* JA-896, JA-850, JA-857. Mr. Newby took this action without having (i) issued any notice that the requests had been made or were under consideration, (ii) issued any notice seeking public comment on the requests; (iii) presenting his action to the Commission to consider or vote on; or (iv) obtaining the required approval of three Commissioners.

20

The Executive Director did not provide a contemporaneous written explanation for these decisions at the time he took action, nor did he state that the EAC had made any conclusion regarding the consistency of the changes with federal law.    During the course of the litigation, Appellees produced a memorandum from Newby dated February 1, 2016 providing a post-hoc explanation for his action.  JA-788.  In that memorandum, Mr. Newby stated that any information concerning why the change was needed was "irrelevant" to his decision.  JA-791.  Appellees also produced a declaration from Mr. Newby, in which he stated he believed that "state-specific voter instructions should be accepted [by the EAC] if they were duly passed state laws affecting the state's registration process," JA-292, a position that was rejected by the Tenth Circuit's express holding "that the EAC is not compulsorily mandated to approve state-requested changes to the Federal Form."  *Kobach*, 772 F.3d at 1194.   The Executive Director did not make (and, as noted, did not have the authority to make) the statutorily-required finding that the requested changes were "necessary" for the States to enforce their voter qualifications.  *See* 52 U.S.C. § 20508(b)(1); *ITCA*, 133 S. Ct. at 2255.

No significant facts or circumstances had changed since the EAC's 2014 decision rejecting requests from Arizona, Georgia and Kansas to modify the Federal Form by requiring documentary proof of citizenship.

21

Upon the Executive Director's modifications to the Federal Form, voter registrants in Alabama, Georgia and Kansas are now being informed that they cannot register to vote in federal elections using the Federal Form without first supplying documentary proof of citizenship.    That is a substantial change in the law because, previously, voter registrants in those states were permitted to register to vote in federal elections using the Federal Form without supplying such evidence.

### H.    The EAC's Action Has Caused Immediate and Irreparable Harm

The Executive Director's decision to change the Federal Form to require documentary proof of citizenship to register to vote in Alabama, Georgia, and Kansas has caused immediate and irreparable harm.  First, it interferes with the rights of eligible individuals (including Appellants' members and those Appellants assist) to register and vote.   Many eligible voters do not have the required citizenship documents or do not have them at locations or times in which voter registration drives are being conducted.   *See* JA-252; JA-259; JA-279; JA-286-87. Potential voters who do not currently possess qualifying documents face substantial costs and burdens to secure such documents.   The registration applications of approximately 26,000 Kansas are currently being held on a "suspense list," whereby voters must provide documentary proof within 90 days or the state will purge their names from its list.   KAN. ADMIN. REGS. § 7-23-15

22

(2016). And while Alabama and Georgia filed last-minute affidavits with the District Court that, as of March, they were temporarily declining to enforce the requirement, voters in all three states are now being informed, via the amended Federal Form instructions, that they may not register to vote in upcoming federal elections without documentary proof of citizenship. JA-157, 61-63. Because of the Federal Form instructions, otherwise eligible voters who lack citizenship documentation have no reason to believe that they can be registered to vote at any time if they submit a Federal Form without such documentation.

Moreover, the Executive Director's decision has forced Appellant organizations to expend and divert substantial resources to educate voters and to comply with the new requirements in the Federal Form. The decision forces Appellants in all affected jurisdictions to expend a substantial portion of their limited resources to restructure their voter registration drives and to educate the public about the new requirements. *See* JA-248; JA-240; JA-249; JA-259-60; JA-270; JA-280; JA-289; JA-253. The change to Federal Form registration rules renders current educational and training materials obsolete, when Appellants have already, in the current election cycle and previously, spent significant time and money to educate voters and other organizations that engage in voter outreach about the voter registration rules. *See* JA-240; JA-281; JA-249; JA-289. Documentary proof of citizenship requirements also harm Appellants by requiring

them to divert resources previously used to help voters register to instead assist eligible applicants secure proof-of-citizenship documents.  *See* JA-249; JA-248.  In Kansas, Appellants have already been expended and diverted resources in this manner.  Instead of spending their time and resources registering additional voters, Kansas League members recently made 115 home visits in a just one county to help registrants on Kansas's suspense list complete their registrations by submitting proof-of-citizenship documentation.  This took 32 hours and yielded only 30 completed registrations.  *See* JA-270.

## I.     Procedural History

On February 12, 2016, 13 days after Mr. Newby's unauthorized action, Appellants filed a complaint in the United States District Court for the District of Columbia seeking declaratory and injunctive relief.  The Complaint alleged that Mr. Newby's action:  (1) exceeded his statutory authority under HAVA, 52 U.S.C. § 20901 *et seq.*;  (2) failed to provide a notice and comment rulemaking period as required by the APA; (3) failed to provide a reasoned explanation for a change in policy as required by the APA; (4) failed to make a determination that documentary proof of citizenship is "necessary" to assess voter eligibility, as required by the NVRA and (5) exceeded the authority delegated to him by a quorum of EAC Commissioners.  The case was assigned to District Judge Richard J. Leon.  On February 17, Appellants moved for a Temporary Restraining Order

24

and Preliminary Injunction, seeking to enjoin Appellees from enforcing Mr. Newby's decision.

On February 19, Appellee-Intervenors Kansas Secretary of State Kris Kobach moved to intervene and the Public Interest Legal Foundation moved to intervene the next day.  The court granted both intervention motions on February 22.

On February 22, the Department of Justice, representing Appellees Mr. Newby and the EAC,  responded to Appellants' motion by conceding that Appellants were entitled to a preliminary injunction enjoining enforcement of Mr. Newby's decisions.  Appellees stated that Mr. Newby had exceeded the scope of his authority by failing to make a determination that documentary proof of citizenship was "necessary" to determine voter eligibility, as required by the NVRA.

On February 23, 2016, despite this concession, the district court denied Appellants' motion for a temporary restraining order, set a hearing on the motion for a preliminary injunction for March 9, and directed the parties to file supplemental briefs prior to the hearing.[5]

---

[5] The district court also permitted the Appellee-Intervenors to conduct discovery regarding the Department of Justice's process for advising the Commission during the 2014 state requests to require documentary proof of citizenship, which was not

25

At the March 9 hearing, Judge Leon recognized the time sensitivity of the matter noting that all parties needed to do all "we can do to expedite this to a resolution on the merits." He further noted that a decision on their motion was needed by "late April, [or] early May, six months [before] November," to ensure any appeal could be completed in time to impact the general elections. JA-696. Supplemental briefing was completed by March 21. On May 27, appellants notified the district court of the recent order by the Supreme Court setting a deadline for a lower court to issue a decision in a voting rights case. *See Veasey v. Abbott*, 136 S. Ct. 1823 (2016).

On June 29, Appellants requested a status conference, and advised the court that, in light of the imminent elections, they would be forced to seek alternative relief unless a ruling was forthcoming. That same day—four and a half months after the motion for preliminary injunction was filed—the district court issued a ruling denying Appellants' motion for a preliminary injunction. The district court summarily rejected the Appellees' assent to injunctive relief, writing "Astonishingly, instead of submitting an opposition [to Plaintiffs' motion for a preliminary injunction], defendants submitted their written *consent* to the entry of a

---

at issue in this litigation. The district court granted the Appellee-Intervenors' request to depose EAC Commissioner Christy McCormick.

preliminary injunction !"    JA-1671.    The District Court similarly summarily

dismissed the argument that there was irreparable harm:

> The organizational plaintiffs argue that they and their
> members will be irreparably harmed absent injunctive
> relief because their voter registration drives will be less
> successful and require more effort . . . and many eligible
> citizens—including some of the organizational plaintiff's
> members—will be unable to register to vote.  I disagree.
> The modification of the Federal Form to include the
> state-specific documentation of citizenship requirements,
> although an inconvenience, in no way *precludes* the
> organizational plaintiffs from conducting their core
> activities of encouraging civic participation in both state
> and federal elections and educating the public about the
> requirements for registering to vote in each. . . [T]o the
> extent these inconveniences and added resources are
> injuries are injuries, they are not actually irreparable. . . .
> The organizational plaintiffs and their members will
> undoubtedly have to expend some additional time and
> effort to help individuals, including some of their own
> members, understand the meaning and effect of the
> instructions on the Federal Form . . . But let's be candid:
> doing so pales in comparison to explaining to the average
> citizen how the ACA or tax code works !

JA-1681-83.  The District Court made these observations without addressing any

of the precedent cited by Appellants that government actions which substantially

burden voter registration activities give rise to a *presumption* of irreparable harm.

## SUMMARY OF THE ARGUMENT

The District Court should be reversed, and this court should enter a

preliminary injunction.  Appellants demonstrate a substantial likelihood of success

on the merits because: the Executive Director acted contrary to law by unilaterally

27

changing EAC policy without the approval of three commissioners; the EAC did not provide a notice and comment period as required by the APA; the EAC reversed its policy and precedent without explanation; the EAC decision exceeds its authority under the NVRA; and the Executive Director failed to follow the Commission's internal procedures and guidelines.   Appellants have suffered irreparable harm because of the Executive Director's decision: Citizens, including Appellants' members and those they assist, are unable to register or face significant burdens; Appellants' voter registration efforts are impeded; and Appellants are expending and diverting resources.   A preliminary injunction will not cause harm to other parties: The EAC merely will be returned to its previous and longstanding regulatory environment, and any minimal inconvenience to the states is attributable to their own actions.   Finally, a preliminary injunction would serve the public interest by supporting the NVRA's policy of promoting voter registration.

## ARGUMENT

## THE DISTRICT COURT'S ORDER DENYING A PRELIMINARY INJUNCTION SHOULD BE REVERSED AND THIS COURT SHOULD ENTER A PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction, a movant must demonstrate:  (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury without injunctive relief; (3) that an injunction would not substantially injure

28

other interested parties; and (4) that the public interest would be furthered by the injunction. *Mills v. D.C.*, 571 F.3d 1304, 1308 (D.C. Cir. 2009). "A district court must balance the strength of a plaintiff's arguments in each of the four elements when deciding whether to grant a preliminary injunction." *Id.* Under this rubric, "[a]n injunction may be justified, for example, if there is a particularly strong likelihood of success on the merits even where there is a relatively slight showing of irreparable injury." *Id.* (alteration in original) (quotation omitted); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (courts may grant injunctive relief if the plaintiff presents a strong probability of success on the merits while demonstrating a likelihood of "at least some injury"). A plaintiff's probability of success on the merits is "the most critical of the criteria when considering a motion for preliminary injunction." *Carey v. FEC*, 791 F. Supp. 2d 121, 128 (D.D.C. 2011); *see also Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011) (substantial likelihood of success on the merits is "often the dispositive" issue in preliminary injunction ruling).

A district court's weighing of the four preliminary injunction factors, along with its ultimate decision to issue or deny such relief, is reviewed for abuse of discretion. *See Mills*, 571 F.3d at 1308. However, "[l]egal conclusions—including

whether the movant has established irreparable harm—are reviewed de novo." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).

Here, the District Court denied Appellants' motion based only on a flawed determination that Appellants failed to establish irreparable harm—a legal conclusion that this Court reviews *de novo*. A full analysis of the four factors makes clear that Appellants are entitled to injunctive relief. Despite Appellants' overwhelming showing of the multiple egregious administrative procedure violations committed by the Executive Director, which have caused irreparable harm to Appellants, the District Court declined to even address the merits of Appellants' claims. Moreover, the District Court badly misjudged the harm from the Executive Director's decision, minimizing the burden of proving citizenship as a mere "inconvenience" to the fundamental right to vote and entirely disregarding the financial losses Appellants have suffered in order to counteract the effect of the Executive Director's unlawful decision which, of course, are unrecoverable under the APA. Therefore, the District Court's decision should be reversed, and a preliminary injunction should be entered vacating the Executive Director's decision and enjoining any further enforcement.[6]

---

[6] The district court also determined that Appellants' requested relief was inappropriate, saying that "the breadth of the preliminary injunction plaintiffs seek here is truly astonishing." JA-1683. To the contrary, Appellants merely sought injunctive relief vacating the Executive Director's decision—implemented just two

### A.    Appellants Demonstrate A Substantial Likelihood of Success on the Merits

First, a preliminary injunction is warranted because Appellants have an exceedingly high likelihood of succeeding on the merits of their claims. Appellants' showing on the merits was so strong that Appellees immediately agreed that the Executive Director's decision was unlawful, and consented to the request for injunctive relief.[7]  The District Court rejected Appellees' concession without reference to the merits.  Nonetheless, Appellants have amply demonstrated a multitude of legal violations by the Executive Director.

### 1.    *The Executive Director Acted Contrary to Law by Unilaterally Changing Longstanding EAC Policy Without the Statutorily Required Approval of Three Commissioners*

In order to ensure that the EAC only acts on policy matters with bipartisan consensus, Congress required that such actions only be taken with the agreement of

---

weeks before Appellants moved for a preliminary injunction.  Such relief would restore the status quo prior to Mr. Newby's unlawful act.  Moreover, the district court was free to order lesser relief, such as preliminarily enjoining the Appellees from implementing Newby's decision, enjoining the States from enforcing the Executive Director's decision, ordering the EAC to temporarily amend the form on the EAC website and requiring the States to accept and use it while the litigation is pending, and taking other appropriate steps to ameliorate the situation pending final relief.  That the court opted not to do so has no bearing on the merits of Appellants' entitlement to preliminary injunctive relief.

[7] Specifically, Appellees agreed that the Executive Director violated the NVRA by failing to make a determination that documentary proof-of-citizenship is "necessary" to assess voter eligibility. *See* Defs.' Resp. to Pls.' Mot. for TRO and Prelim. Inj. at 10-11 (Feb. 22, 2016).

31

three of the agency's four commissioners.[8]   HAVA unambiguously states: "Any action which the Commission is authorized to carry out under [HAVA] may be carried out only with the approval of at least three of its members."   52 U.S.C. § 20928; *see also* NVRA, 59 Fed. Reg. 11,211 (Mar. 10, 1994); NVRA, 58 Fed. Reg. 51,132 (Sept. 30, 1993).   Accordingly, to take any action on the States' requests, the Commission was required to approve (and to authorize a notice and comment rulemaking if it wanted to change its longstanding policy).[9] The Executive Director failed to obtain any such approval from the Commissioners here.

---

[8] Appointment to the Commission is designed to ensure that the Commission always has two members from each major political party.  *See* 52 U.S.C. § 20923(a)(2) ("[B]efore the appointment of any individual to fill a vacancy on the Commission, the Majority Leader of the Senate, the Speaker of the House of Representatives, the Minority Leader of the Senate, and the Minority Leader of the House of Representatives shall each submit to the President a candidate recommendation with respect to each vacancy on the Commission affiliated with the political party of the Member of Congress involved.").

[9] While the Tenth Circuit in *Kobach* recognized that the approval of three Commissioners is required to carry out any action authorized under HAVA, *see Kobach*, 772 F.3d at 1193, in *dicta* the Court suggested that because "§ 20928 [of HAVA] explicitly applies only to actions authorized in the same chapter," the three-vote requirement did not apply to the"[t]he decision at issue in [*Kobach*]," as it "was authorized by 52 U.S.C. § 20508, which was contained in a different chapter of the Code when § 20928 was passed." *Id*.  As the district court in this case noted, however, the Statutes at Large version of HAVA makes clear the three-vote requirement does in fact apply to actions taken with regard to the federal form.  JA-1664 n.4.

It is undisputed that three Commissioners did not vote to or otherwise approve the Executive Director's change in EAC policy. This renders the Executive Director's decision *ultra vires*. *See New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 676 (2010) (invalidating actions taken by two members of the National Labor Relations Board ("NLRB") when the statute required a quorum of at least three members to be present). Where there is a functioning Commission with a quorum, there is no valid procedure under any statute or other authority by which the Executive Director can unilaterally change agency policy. Indeed, the sole Democratic Commissioner, Tom Hicks, openly objected to the Executive Director's decision and demanded a full Commission vote on the States' requests. *See* JA-408. No such vote has been held. Even if the two Republican Commissioners support the Executive Director's actions, they cannot circumvent HAVA's three-vote requirement by permitting the Executive Director to act on his own. The Executive Director's actions in this must therefore be set aside as *ultra vires* and contrary to the governing law. 5 U.S.C. § 706(2)(C) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . .").

33

2.      *The EAC Failed to Provide a Formal Notice and Comment Period as Required by the Administrative Procedure Act*

"The Administrative Procedure Act's general rulemaking section, 5 U.S.C. § 553, sets down certain procedural requirements with which agencies must comply in promulgating legislative rules." *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 752 (D.C. Cir. 2001). Specifically, "there must be publication of a notice of proposed rulemaking; opportunity for public comment on the proposal; and publication of a final rule accompanied by a statement of the rule's basis and purpose." *Id.*; *see also Chamber of Commerce v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999). Accordingly, "[i]f the agency fails to provide this notice and opportunity to comment . . . , the 'regulation must fall on procedural grounds, and the substantive validity of the change . . . need not be analyzed.'" *Pub. Citizen, Inc. v. Mineta*, 427 F. Supp. 2d 7, 12 (D.D.C. 2006) (quoting *AFL-CIO v. Donovan*, 757 F.3d 330, 338 (D.C. Cir. 1985)). An agency may only change a rule or fixed policy using the "same procedures [as the agency] used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015); *see also Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 241 (D.C. Cir. 1992) ("[W]hen an agency adopts a new construction of an old rule that repudiates or substantially amends the effect of the previous rule on the public . . . the agency must adhere to the notice and comment requirements of § 553 of the APA.").

34

The Federal Form was developed by the FEC in accordance with the goals of the NVRA through official notice and comment rulemaking, and did not require documentary proof from any registrants. *See* NVRA, 59 Fed. Reg. 11,211 (Mar. 10, 1994); NVRA, 58 Fed. Reg. 51,132 (Sept. 30, 1993). Over the next decade, the EAC consistently rejected all state requests to require documentary proof of citizenship. The Commission, with a full quorum, rejected such a request from Arizona in March 2006 and again with a 2-2 vote in July 2006. Most recently, in 2014, the EAC's then-Executive Director considered and rejected earlier requests from all three States, but only after conducting a notice and comment process. *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1188-89 (10th Cir. 2014) ("After receiving and reviewing 423 public comments, including comments from Arizona, Kansas, and each of the Intervenor-Appellants, the EAC's Executive Director issued a memorandum on January 17, 2014, denominated as final agency action, denying the states' requests.").

Here, the EAC did not conduct a formal notice and comment proceeding. Nor did the Commission vote on the States' requests before the Executive Director granted them. The Executive Director's failure to follow EAC procedures by not conducting a notice and comment rulemaking and not presenting the matter for a vote of the Commission renders the Executive Director's decision *ultra vires*.

35

### 3.    *The EAC Did Not Articulate Any Rationale for its Reversal of Policy and Precedent*

An agency's decision to cast off its prior policies and legal decisions must be the product of reasoned decision-making; otherwise, the rule must be invalidated as arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of The U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."). Executive agencies are required to explain the bases for their decisions. Indeed, "[i]t is axiomatic that an agency choosing to alter its regulatory course must supply a reasoned analysis indicating that its prior policies and standards are being deliberately changed, not casually ignored." *Action for Children's Television v. FCC*, 821 F.2d 741, 745 (D.C. Cir. 1987) (quotation omitted); *see also FCC v. Fox Television Stations*, 556 U.S. 502, 535 (2009) (Kennedy, J., concurring in part and concurring in the judgment) ("[A]n agency's decision to change course may be arbitrary and capricious if the agency sets a new course that reverses an earlier determination but does not provide a reasoned explanation for doing so."); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687-91 (9th Cir. 2007) (without reasoned explanation, agency departure from a two-decade-old precedent is arbitrary and capricious); *see also INS v. Yang*, 519 U.S. 26, 32 (1996). When an agency fails to explain a change in course, this

36

"unexplained departure from prior agency determinations is inherently arbitrary and capricious" and, therefore, must be overturned. *Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 404 F.3d 454, 457 (D.C. Cir. 2005) (quotation omitted); *see also Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) ("[A]n agency's unexplained departure from precedent must be overturned as arbitrary and capricious.").

Prior to the initiation of this litigation, the Executive Director did not provide *any* explanation for the change in the EAC's policy, and failed to point to any changed circumstances or new evidence. As the Tenth Circuit previously found, accepting the States' position without new evidence would "risk[] arbitrariness, because [. . .] [c]hanging course and acceding to their requests absent relevant new facts would conflict with the EAC's earlier decision." *Kobach*, 772 F.3d at 1198 (citing *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 550 (D.C. Cir. 2009)). Nevertheless, the Executive Director "offered neither facts nor analysis to the effect" that new evidence warranted departure from EAC precedent. *See Action for Children's Television*, 821 F.2d at 746. To the contrary, he provided no contemporary explanation at all for his "*volte face*," making his abrupt departure from EAC precedent "intolerably mute." *Id.* This "failure to follow [the EAC's] own well-established precedent without explanation is the very essence of

37

arbitrariness" and the decision therefore must be set aside.  *Nat'l Treasury Emps. Union*,  404 F.3d at 457; *see also Comcast Corp.*, 526 F.3d at 769.

Only in the context of this litigation did the Executive Director release a private memorandum and declaration purporting to explain his decision-making process concerning the States' requests.  *See* JA-788 & JA-291.  However, these documents do not satisfy the APA's reasoned decision requirement. "'[T]he focal point for judicial review' under the [APA] 'should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 945 (D.C. Cir. 2006) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). Those documents are, at best, post-hoc rationalizations on which his actions cannot be sustained.  *See Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) ("Agency decisions must generally be affirmed on the grounds stated in them. [. . .] Post-hoc rationalizations, developed for litigation are insufficient."). Therefore, the documents provided by the Executive Director in the course of this litigation cannot constitute the reasoned explanation for a change in policy required by the APA.

> 4.   *The EAC's Decision Exceeds Its Statutory Authority Under the NVRA*

The NVRA prescribes the Federal Form's specific content and requirements, and the form "may require only such identifying information . . . as is *necessary* to

38

enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1).  Here, the Executive Director failed to make any finding that documentary proof of citizenship is "necessary to enable the [States] to assess the eligibility of the applicant," *Id.*  The Appellees conceded this failing below.

Importantly, when Congress passed the NVRA, it considered but rejected language allowing states to require "presentation of documentation relating to citizenship of an applicant for voter registration."  *See* 139 Cong. Rec. 5098 (1993).[10]  In rejecting this provision, the conference committee determined that such a requirement was "not necessary or consistent with the purposes of this Act," could "permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act," and "could also adversely affect the administration of the other registration programs . . . ." *Id.*

---

[10] Instead, Congress has enacted specific provisions as to what the form may and may not contain.  For example, the form "may not include any requirement for notarization or other formal authentication."  52 U.S.C. 20508(b)(3).  The Federal Form must, however, "include a statement that . . . specifies each eligibility requirement (including citizenship)"; "contain[ ] an attestation that the applicant meets each such requirement"; and "require[ ] the signature of the applicant, under penalty of perjury." 52 U.S.C. § 20508(b)(2). Additionally, pursuant to HAVA, the Federal Form must include two specific questions and check boxes for the applicant to indicate whether he meets the U.S. citizenship and age requirements to vote. 52 U.S.C. § 21083(b)(4)(A).

"An agency action is arbitrary, capricious, or an abuse of discretion when it . . . frustrate[s] the policy that Congress sought to implement." *Beaty v. FDA*, 853 F. Supp. 2d 30, 41 (D.D.C. 2012) *aff'd in part, vacated in part sub nom. Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013) (internal citations and quotation marks omitted). As the EAC previously acknowledged, "Congress's rejection of the very requirement that . . . Georgia[ ] and Kansas seek here is a significant factor the EAC must take into account in deciding whether to grant the States' requests." JA-1089-90 (citing *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the [States] urge[ ] here weighs heavily against the [States'] interpretation.")).

Here, the Executive Director failed to make any finding that documentary proof of citizenship is "necessary to enable the [States] to assess the eligibility of the applicant," 52 U.S.C. § 20508(b)(1). Mr. Newby concedes that he did not rely on any of the evidence the Secretary submitted to demonstrate "necessity," thus confirming that even the Executive Director rejected the only possible (albeit inadequate) evidence offered in support of Kansas's assertion that documentary proof had suddenly become "necessary." *See* JA-791. And as the EAC and Mr. Newby both admit, Mr. Newby did not conclude that the States presented sufficient evidence demonstrating documentary proof of citizenship is "necessary to enable the [States] to assess the eligibility of the applicant," 52 U.S.C. §

40

20508(b)(1), the conclusion required by the statute and by the Supreme Court in *ITCA*. The failure to make that finding violated the NVRA and the APA as a matter of law.  And, Mr. Newby's post-hoc memorandum does not make even a passing reference to prior EAC decisions rejecting identical requests, let alone provide a reasoned explanation as to why those decisions were "being deliberately changed," as opposed to "casually ignored."  *Action for Children's Television*, 821 F.2d at 745.

By adding requirements above and beyond those Congress deemed necessary  in the Federal Form without making any determination of necessity, the Executive Director exceeded the EAC's statutory authority unambiguously set forth in the NVRA, and exercised his purported authority in a manner "the statute simply cannot bear."  *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1178 (D.C. Cir. 2003).  Courts must set aside agency actions that are "in excess of statutory … authority … ."  5 U.S.C. § 706(2)(C).

> 5.    *The Executive Director Failed to Follow the EAC's Own*
>        *Internal Procedures and Guidelines*

The Executive Director also lacked the authority under the EAC's own policies and procedures to unilaterally change the EAC's longstanding policy and legal position that documentary proof of citizenship is not "necessary" within the NVRA's meaning.  The agency's own governing documents specify that only the Commissioners could make policy decisions; the Executive Director is empowered

41

only to make *recommendations* with respect to policy matters.  *See* JA-1014; *see also Fort Stewart Schs. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide" by its own governing rules and regulations); *The Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C. Cir. 1979) ("It is a well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action." (quotation omitted)); *VanderMolen v. Stetson*, 571 F.2d 617, 624 (D.C. Cir. 1977) ("It is, of course, a fundamental tenet of our legal system that the Government must follow its own regulations.  Actions by an agency of the executive branch in violation of its own regulations are illegal and void." (citation omitted)).

The Executive Director's authority does *not* include making or changing EAC policy under the EAC's own internal rules.  Pursuant to the "Election Assistance Commission Organization Management Policy Statement" (the "2015 Policy Statement"), which is currently in effect, "Commissioners shall make and take action in areas of policy," including "setting rules, guidance or guidelines," and "make[] policy through the formal voting process."  JA-1014.  By contrast, "[t]he Executive Director, in consultation with the Commissioners," may only "(1) *prepare* policy recommendations for commissioner approval, (2) *implement* policies *once made*, and (3) take responsibility for  administrative matters."  *See id.* (emphasis added).  Whether to require documentary proof of citizenship for

42

Federal Form voters is plainly a core policy concern of the Commissioners, as shown by the prior commission-level attention that the EAC has devoted to the subject. *See supra* Part I.B. Tellingly, while the Commission previously specifically delegated authority to the Executive Director to maintain the Federal Form *consistent* with the EAC's established policies in 2008, JA-1002, which the Tenth Circuit upheld in *Kobach*, the EAC rescinded that grant in 2015. Just as an agency can delegate certain responsibilities to subordinates, it also can retract a prior delegation of authority, as the Commission did here. *See Black v. Snow*, 272 F. Supp. 2d 21, 26 (D.D.C. 2003), *aff'd sub. nom. Black v. Ashcroft*, 110 F. App'x 130 (D.C. Cir. 2004).

In this instance, the Executive Director plainly changed agency policy, rather than maintaining the Federal Form consistently with policies the agency's commissioners had established.

An agency's failure to comply with its own internal procedures is a separate and independent ground for concluding the Executive Director's actions were arbitrary, capricious and an abuse of discretion. *See Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (explaining that "federal agencies are required to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions"); *IMS, P.C. v. Alvarez*, 129 F.3d 618, 621 (D.C. Cir. 1997) ("It is a well-settled rule that an agency's failure to follow its own regulations is fatal to deviant

43

action") (internal quotation marks omitted); *see also Mazaleski v. Treusdell*, 562 F.2d 701, 717-19 & n.38 (D.C. Cir. 1977) (invalidating agency action that was inconsistent with agency personnel manual).   Here the Executive Director's unilateral action unlawfully exceeded the limited scope of authority granted to him by the Commission.

## B.    Appellants Have Suffered Irreparable Harm Due to the Executive Director's Decision

In light of Appellants' particularly strong showing of likelihood of success on the merits of their challenge to the Executive Director's unlawful actions, preliminary injunctive relief is proper so long as they can make even "a relatively slight showing of irreparable injury." *Mills*, 571 F.3d at 1308.  Here, Appellants have made a strong showing of irreparable harm, akin to the injury shown by similarly-situated plaintiffs in cases throughout the country, making injunctive relief eminently proper. Nevertheless, the District Court erroneously found that Appellants had suffered *no* irreparable harm, and rested its denial of injunctive relief entirely on that finding.  The District Court's decision in this regard is a legal conclusion subject to *de novo* review in this Court.  *See Davis*, 571 F.3d at 1291.

Plaintiffs have amply demonstrated that absent an injunction, Mr. Newby's actions will irreparably harm both Appellants and eligible voters.  Every day that the Executive Director's unlawful action is allowed to stand, Appellants remain restricted in their ability to help eligible voters register for the November elections

44

and eligible voters are losing the opportunity to register to vote.  Plaintiffs have

demonstrated three discrete irreparable harms caused by the Executive Director's

actions:

> (1) Citizens—including Appellants' members and those they assist—are unable to register to vote or face significant burdens;
> (2) Appellants' voter registration efforts are impeded; and
> (3) Appellants are being forced to expend and divert money and other resources to comply with the new requirements.

These harms are irreparable, especially in light of the impending election: "once

the election occurs, there can be no do-over and no redress." *League of Women*

*Voters of N.C. v. N.C.*, 769 F.3d 224, 247 (4th Cir. 2014).

Abundant case law confirms that when official actions interfere with voter

registration drives or making it harder for citizens to register and vote, the resulting

injuries are clearly irreparable and are grounds for a preliminary injunction.  *See*

*id.*; *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012); *League of Women*

*Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012), *appeal*

*dismissed*, Case No. 12-13522 (11th Cir. Aug. 24, 2012); *Project Vote v.*

*Blackwell*, 455 F. Supp. 2d 694, 699 (N.D. Ohio 2006); *Wash. Ass'n of Churches*

*v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006).  All of this case law was

presented—and ignored—by the district court.

45

1.     *Citizens (including Appellants' members and those they assist) are unable to register to vote or face significant burdens*

The Executive Director's actions have already impaired the rights of voters —including Appellants' members and those they seek to register—in Kansas, Alabama, and Georgia.  Already tens of thousands of people who have attempted to register in Kansas have been unable to do so; those citizens have already lost their right to vote in the recent federal primary elections.  Potential voters in all three states now face significant new obstacles to registering to vote in federal elections.  "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. N.C.*, 769 F.3d at 247.

As a result of the Executive Director's action, citizens who would otherwise be able to register using the Federal Form cannot now do so if they lack documentary proof of citizenship.  Appellants have demonstrated that many eligible voters do not have the required citizenship documents or do not have the documents with them when voter registration drives are being conducted.  *See* JA-252; JA-259; JA-279; JA-286-87.  A November 2006 study found that as many as 7 percent of voting-age American citizens do not have ready access to citizenship documents.  *See* JA-243; JA-286; *see Citizens without Proof*, Brennan Center for Justice, 2-3 (Nov. 2006), http://www.brennancenter.org/analysis/citizens-without-proof. Among citizens who have struggled with obtaining documents are Appellants' members and individuals they seek to register.  *See, e.g.*, JA-625-26.

46

Appellants' have further demonstrated that many of those without documentary proof of citizenship face significant—and for some, insurmountable—burdens in obtaining such documents.  Among those burdens is the high cost of procuring documentary proof.  *See* JA-279 (cost of birth certificate in Alabama "can exceed $30," a "prohibitive financial expense" for many); JA-258-59.  Those burdens are particularly heavy for citizens from underrepresented communities targeted by Appellants' voter registration drives, *see* JA-258-59; JA-279, JA-283, JA-288, and for married women who have changed their names, *see* JA-258 (describing woman who needed to locate her marriage license to obtain required documentation); JA-279.  For example, Robert Gann of Kansas, whom the League attempted to help register to vote, was unable to afford the $22 required for his Texas birth certificate, the least expensive form of documentary proof of citizenship available to him.  *See* JA-625-26.  Kansas League member Mary Curtiss McCrea, whose birth certificate did not reflect her current married name, went through tremendous bureaucratic hurdles and expense to demonstrate her citizenship to the satisfaction of a Kansas clerk.  *See* JA-626. Many others have not registered because they were unwilling or unable to overcome those hurdles.  *See* JA-627.

In Kansas alone, proof of citizenship has already kept tens of thousands off the rolls:  Since implementing its new requirement, Kansas has maintained a

47

"suspense list" of individuals whose registrations could not be completed because of their supposed failure to provide documentary proof of citizenship. In January 2014, only a year after the requirement was first enforced, that list contained over 20,000 names. JA-48. By August 2015, it exceeded 35,000, and as of February 2016 (the approximate time at which Mr. Newby approved the request), after Kansas implemented a new policy of removing the names of those whose applications have been incomplete for over 90 days, the suspense list still contained more than 10,500 names. *Id.* In April 2016, the number rose to 16,775. *John Whitesides, Thousands of voters in limbo after Kansas demands proof they're American,* REUTERS, Jun. 2, 2016, *available at* http://www.reuters.com/article/us-usa-votingrights-kansas-insight-idUSKCN0YN4AQ. As of July 12, the list stood at approximately 26,000. These voters must provide documentary proof within 90 days or the state will purge their names from its list. KAN. ADMIN. REGS. § 7-23-15 (2016). And as a result of Mr. Newby's action, they cannot use the Federal Form as a backstop to register to vote in federal elections without documentary proof of citizenship.

The district court did not squarely address Appellants' claims that they will be unable to register voters who have a lawful right to vote, and that some of Appellants' members will be unable to register because they lack the newly-required documents. Instead, the court dismissed these concerns because, with

respect to those citizens whose registrations have been rejected in Kansas, Secretary Kobach represented that "the State of Kansas will retroactively register" those who submitted incomplete Federal Forms.    JA-1682.    No similar representation was made on behalf of Alabama and Georgia.

But if the court denies preliminary relief and a decision comes *after* the November elections, "retroactive[] regist[ration]" obviously would not fix the problem.   Indeed, countless voters have lost out on their ability to vote in the primary elections as a consequence of the district court's delay and failure to grant preliminary relief.   Further, the conclusion that "retroactive registration" could fix the problem rests on the improbable assumption that every citizen who lacks proof of citizenship but wants to vote will ignore the current instructions on the Federal Form and attempt to register anyway. The right to vote cannot depend on such wishful thinking.   As the court succinctly stated in *League of Women Voters of Florida v. Browning*, "when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever."   863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012). Such opportunities are being lost every day and have been since February.   "[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin [the] law." *League of Women Voters of N.C.*, 769 F.3d at 227.

Indeed, a federal court recently enjoined Kansas's documentary proof of citizenship requirement with respect to individuals who register at the state's division of motor vehicles, citing extensive burdens imposed by the "confusing and inconsistently-enforced maze of requirements" under Kansas's law. *Fish v. Kobach*, -- F. Supp. 3d --, 2016 WL 2866195, at *28 (D. Kan. May 17, 2016). The burdens of the law were causing a "chilling effect" that dissuaded those without citizenship documents from trying to register, *id*. at *27; that $24 for a replacement birth certificate would be a financial burden for a plaintiff of limited means, *id*. at *9; and that the "sheer number of people cancelled or held in suspense … evidences the difficulty of complying with the law as it is currently enforced," the court concluded, *id*. at *20. Those burdens are indicative of the harm imposed on Appellants and their members as they try to navigate a maze of unnecessary barriers to registration.

### 2. *Appellants' voter registration efforts are impeded*

The Executive Director's actions have also substantially interfered with Appellants' voter registration efforts, despite their best efforts to comply with the new burdens. Appellants' organizational missions are to increase participation by helping voters register, and proof-of-citizenship requirements severely undermine their ability to do so. Before the Executive Director's decision, if a registrant did not have documentary proof-of-citizenship readily available, Appellants could still

50

help them register for federal elections with the Federal Form.  Because of the Executive Director's actions, that option is lost.

Appellants conduct voter registration drives as a key part of their mission of promoting voter participation and civic engagement, *see* JA-262-63; JA-236; JA-257; JA-275; JA-284; JA-248; JA-249.   Appellants concentrate their voter registration drives at locations that reach large numbers of unregistered voters, such as schools, sporting events, naturalization ceremonies, shopping malls, and transportation hubs.   *See* JA-263; JA-276-77; JA-251; JA-257; JA-285.   The individuals they seek to help register at these events are unlikely to have documentary proof of citizenship with them.  *See* JA-252-53; JA-259; JA-279; JA-286.  Even if applicants did carry such documents with them, many of Appellants' members and other individuals who participate in the voter registration drives they organize would not have the capacity to make copies of those documents to submit along with registration forms.   *See* JA-259; JA-265; JA-278-79; JA-287.  Moreover, many of Appellants' members and those who participate in their voter registration drives do not feel comfortable handling sensitive citizenship documents such as birth certificates, *see* JA-265; JA-279, and some potential registrants may decline to register through Appellants' drives because they feel uncomfortable providing such sensitive documents to a person they do not know,

51

*see* JA-287.   As a result, proof-of-citizenship requirements have reduced dramatically the number of voters Appellants can register.  *See* JA-265-67.

The Executive Director's actions harm Appellants by reducing their ability to use the Federal Form as an important tool for bolstering democratic participation, *see* JA-268, JA-253; JA-280, and as a simple backup to potentially cumbersome state voter registration procedures, *see* JA-288.  Appellants League of Women Voters of Kansas use the Federal Form for the specific reason that it did not require documentary proof of citizenship and can be used for Federal Elections as a backstop.  *See* JA-268.  Similarly, although Appellant Project Vote seeks to help voters register in all elections, it recommends the use of the Federal Form  for individuals who do not have documentary proof and could not otherwise become registered.  *See* JA-288.  Without this option, Appellants can only effectively register voters door-to-door, since potential voters are more likely to have citizenship documents in their own homes.  *See id.*  This is a far more costly and less efficient method of reaching potential voters.

In Alabama and Georgia, Appellants are currently suffering irreparable harm because of the confusion caused by the Executive Director's decision.  The Federal Form's state-specific instructions now indicate to Alabama applicants that they must provide "satisfactory evidence of United States citizenship" in order to be properly registered despite the fact that Alabama claims it is not currently

enforcing the requirement.  JA-157.  The Georgia instructions indicate applicants will only "be found eligible to vote by supplying satisfactory evidence of U.S. citizenship."  JA-161.  Not only does this introduce confusion into the voting and registration processes in these states, it discourages eligible voters from registering at all if they do not have the purportedly required documents.

Appellant organizations are also being harmed in their efforts to plan registration activities because there is no way to know when Georgia or Alabama eventually do decide to implement their proof of citizenship laws.  Although the Federal Form instructions are evidently wrong as of July 18, there is currently no legal barrier to Georgia and Alabama electing to implement the proof of citizenship laws at any time.  Georgia has twice represented it may implement the Executive Director's decision, only for Secretary Kobach to provide declarations from the Georgia Secretary of State at hearings in this matter stating otherwise.  *See, e.g.*, SA-100.  The Alabama and Georgia Leagues have numerous registration drives leading up to voter registration deadlines, *see* JA-633-34;JA-629-30, but now must run their drives with no clarity as to their states' plans.

This uncertainty causes confusion and risk to Appellant organizations who, in trying to educate voters, could inadvertently provide outdated information that negatively impacts persons' ability to register to vote.  *See* JA-289-90.

3.     *Appellants have been forced to expend and divert money and other resources to comply with the new requirements*

The proof of citizenship requirement has already required Appellants to spend money and other resources to educate potential voters about the proof of citizenship requirement and to attempt to help voters register, and the Executive Director's decision exacerbates these burdens.  For example, the Kansas League previously spent $13,000 on materials that are now largely obsolete, and the Kansas League will be forced to spend a significant amount to replace them. JA-270-71. The Kansas League will also need to expend resources to assist individuals who have submitted voter registration applications without proof of citizenship documents.  Recent efforts have included home visits, which take many hours of members' time.  JA-270. Appellants from Alabama and Georgia will face similar burdens if the proof of citizenship requirement continues in their states.  *See* JA-281; JA-253; JA-258-60; JA-249; JA-248.

This district court, however, did not directly address Plaintiffs' declarations that they have spent and will spend money, time, and other resources as a result of the proof of citizenship requirement.  Rather, it concludes that the injury is insufficient because explaining the Executive Director's decision "pales in comparison to explaining to the average citizen how the ACA or tax code works[.]"  JA-1682-83. Yet the existence of unrelated and separate, complex statutes does not change the fact that Plaintiffs will have to spend significant

54

amounts of money and assistance, training, and production time as a result of the Executive Director's decision—resources that the League would otherwise spend in other ways critical to its mission.

The district court also minimized the burdens faced by the Kansas League based on the assumption that League members would be attempting to register individuals for state elections, regardless of the Federal Form requirements. This ignores the specific resources in terms of both time and money that the League has had and will have to devote to dispelling confusion and changing training modules directly because of the Executive Director's change to policy on the Federal Form. It also says nothing of the entirely new burdens faced by Applicants in Alabama and Georgia, who do not face a similar dual registration system; any diversion of resources in these states is entirely attributable to the Executive Director's action.

But, what the District Court fails to explain—or even address—is the fact that such economic losses occasioned by the Executive Director's unlawful actions are irreparable. Although "economic loss does not, in and of itself, constitute irreparable harm," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), *aff'd in part, remanded in part* 770 F.2d 1144 (D.C. Cir. 1985), that "rest[s] on the assumption that the economic losses are recoverable." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, (8th Cir. 1996). Thus, economic loss is irreparable "[w]here a plaintiff cannot recover damages from an agency because the agency has sovereign

55

immunity[.]"  *Smoking Everywhere, Inc. v. USDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010).  Here, as they must, Appellants challenge the Executive Director's unlawful action under the APA, and "the APA waives sovereign immunity for all claims seeking '*relief other than money damages*.'"  *Robles v. Kerry*, 74 F. Supp. 3d 254, 260 (D.D.C. 2014) (emphasis added) (quoting 5 U.S.C. § 702). Accordingly, the APA precludes Appellants from securing from the Government "compensation for the loss[es] resulting from the" Executive Director's unlawful actions, *see Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999), making Appellants' economic losses irreparable.  *Smoking Everywhere, Inc.*, 680 F. Supp. 2d at 77 n.19.

> ### C.     There is No Possibility of Harm to Other Parties if Relief is Granted

In order to sustain a motion for temporary injunctive relief, a moving party must show that the injunction would "not substantially injure other interested parties."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  When agency action is involved, the Court should balance the actual irreparable harm to the plaintiff and the potential harm to the government. *See Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 429 (2006).  In this case it is clear that the EAC and the Executive Director will suffer no cognizable injury if enjoined from enforcing their unauthorized letters to the States.  If this court provides the injunctive relief requested, the EAC and the

56

Executive Director will merely be returned to the policy environment that the agency, with good reason, determined was required by the NVRA for the past twenty years. *See, e.g., Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014). Indeed, as the *Fish* Court noted in enjoining Kansas from requiring documentary proof of citizenship on motor vehicle registration forms, "[i]f a State wishes to change voter registration laws that directly contradict the provisions of the NVRA, it does so at its own risk."). *Fish*, 2016 WL 286619. at *30.

Additionally, Alabama and Georgia will not be harmed in that—per the affidavits they submitted to the District Court—they have not begun enforcing the Executive Director's decision. Kansas will face only minor administrative costs to re-process certain registration applications—a miniscule harm compared to the harm disenfranchised voters and registration organizations currently face. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (concluding that burden on voters "outweighs any corresponding burden on the State," which would be required to add three extra days of in-person early voting).[11] Appellee-Intervenor Kansas will simply be required to do what it already must do to further the NVRA's purpose of helping, not hindering, voter registration.

_____

[11] This is especially so in light of the recent district court opinion ruling that Kansas must permit those who registered at Division of Motor Vehicles offices to vote in federal elections.

57

### D.     There is a Strong Public Interest in Granting Appellants' Motion

Finally, in considering whether to grant temporary injunctive relief, the Court must consider whether "the public interest would be furthered by the injunction." *Baumann v. D.C.*, 655 F. Supp. 2d 1, 6 (D.D.C. 2009).  The public interest is undoubtedly served by maintaining the EAC's long-term implementation of the NVRA.  Denying Appellants' request for injunctive relief would upend two decades of agency policy, frustrate a central purpose of the NVRA, harm citizens residing in Alabama, Georgia and Kansas who lack the documentation the States demand, and harm the election process more generally.

"By definition, 'the public interest favors permitting as many qualified voters to vote as possible.'" *League of Women Voters of N.C.*, 769 F.3d at 247 (alterations omitted) (quoting *Husted*, 697 F.3d at 437).

In enacting the NVRA, Congress explicitly sought "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1).  The  Executive Director's decision has altered a status quo that has governed voter registration in federal elections for over twenty years and has frustrated the public's compelling interest in a simple, straightforward voter registration process just weeks before presidential primary elections and months before other federal primary and general elections.  As the Supreme Court warned, giving States *carte blanche* to add all of their state-specific

58

requirements to the Federal Form would result in "the Federal Form ceas[ing] to perform any meaningful function," and becoming "a feeble means of 'increas[ing] the number of eligible citizens who register to vote in elections for Federal office.'" *ITCA*, 133 S. Ct. 2247, 2256 (2013) (quoting 52 U.S.C. § 20501(b)). Therefore, there is a strong public interest in granting temporary injunctive relief.

The public interest especially favors injunctive relief given the timing of the Executive Director's imposition of new restrictions on voter registration, which comes in a Presidential election year. Voters have been using the Federal Form to register without having to comply with a documentary proof of citizenship requirement for over two decades, but the Executive Director's unilateral changes to the Federal Form—implemented without public notice—ratcheted up the requirements for registering to vote.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court for the District of Columbia and grant Appellants' motion for a preliminary injunction.

July 18, 2016                                        Respectfully submitted,

                                                    By:  /s/ Jonathan D. Janow
                                                    Jonathan D. Janow
                                                    D.C. Bar No. 1002399
                                                    KIRKLAND & ELLIS LLP
                                                    655 Fifteenth Street, NW, Suite 1200
                                                    Washington, DC  20005
                                                    (202) 879-5000
                                                    jonathan.janow@kirkland.com

                                                    - and –

                                                    Michael C. Keats
                                                    Joel T. Dodge
                                                    Chelsea L. Goulet
                                                    STROOCK & STROOCK & LAVAN LLP
                                                    180 Maiden Lane
                                                    New York, New York 10038
                                                    (212) 806-5400
                                                    mkeats@stroock.com

                                                    Amelia J. Schmidt
                                                    D.C. Bar No. 1012380
                                                    STROOCK & STROOCK & LAVAN LLP
                                                    1875 K Street NW
                                                    Washington, DC 20006
                                                    (202) 739-2800
                                                    aschmidt@stroock.com

60

Wendy R. Weiser
Jonathan Brater
Tomas Lopez
Robert Ferguson
BRENNAN CENTER FOR JUSTICE
161 Avenue of the Americas, 12th Floor
New York, New York 10013
(646) 292-8310
wendy.weiser@nyu.edu

*Attorneys for Appellants the League
of Women Voters of the United
States, the League of Women
Voters of Kansas, the League of
Women Voters of Alabama, and the
League of Women Voters of
Georgia*

Dale E. Ho
D.D.C. Bar No. NY0142
Orion Danjuma
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
dale.ho@aclu.org

Stephen Douglas Bonney
ACLU FOUNDATION OF KANSAS
6701 W. 64th Street, Ste. 210
Overland Park, KS 66202
(913) 490-4102
dbonney@aclukansas.org

Jon M. Greenbaum
D.C. Bar No. 489887
Ezra D. Rosenberg
D.C. Bar No. 360927
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

*Attorneys for Appellants*
*Marvin Brown, JoAnn Brown,*
*the Georgia State Conference*
*of the NAACP, and Georgia*
*Coalition for the People's Agenda*

Linda Stein
D.C. Bar No. 376217
Errol R. Patterson
D.C. Bar No. 379715
Jason Abel
D.C. Bar No. 490382
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-3000
lstein@steptoe.com

*Attorneys for Appellants the*
*Georgia State Conference of*
*the NAACP, and Georgia*
*Coalition for the People's Agenda*

John A. Freedman
D.C. Bar No. 453075
R. Stanton Jones
D.C. Bar No. 987088
Elisabeth S. Theodore
D.C. Bar No. 1021029
ARNOLD & PORTER LLP
601 Massachusetts Ave., N.W.
Washington, DC  20001
(202) 942-5000
John.Freedman@aporter.com

Michelle Kanter Cohen
D.C. Bar No. 989164
PROJECT VOTE
1420 K Street, 7th Floor
Washington, DC 20005
(202) 546-4173
mkantercohen@projectvote.org

*Attorneys for Petitioner Project Vote*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

I certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,704 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14 Point Times New Roman.

*/s/* Jonathan D. Janow
Jonathan D. Janow

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/* Jonathan D. Janow
Jonathan D. Janow