ORAL ARGUMENT SCHEDULED SEPTEMBER 8, 2016
No. 16-5196

In The

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

*LEAGUE OF WOMEN VOTERS, ET AL.,*
*Plaintiffs-Appellants,*

v.

*NEWBY, ET AL.,*
*Defendants-Appellees,*

*and*

*SECRETARY OF STATE OF KANSAS,*
*Intervenor – Defendant – Appellee*

On Appeal from the
United States District Court for the District of Columbia
Case No. 1:16-cv-00236 (Hon. Richard J. Leon)

**BRIEF FOR APPELLEE-INTERVENOR**
**SECRETARY OF STATE OF KANSAS**
**PUBLIC COPY – SEALED MATERIAL DELETED**

Kris Kobach*
Garrett Roe
    D.C. Cir. No. 55423
OFFICE OF THE KANSAS SECRETARY OF STATE
120 SW 10th Ave, Memorial Hall, First Floor
Topeka, KS  66612
Ph: 785-296-8473
Fax: 785-368-8032
Kris.kobach@ks.gov
Garrett.roe@ks.gov
*Attorneys for Appellee Intervenor Kansas Secretary of State*
                                        *Admission sought

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.     Parties and Amici

Plaintiffs in the district court, who are appellants in this Court, are the League of Women Voters of the United States; League of Women Voters of Alabama; League of Women Voters of Georgia; League of Women Voters of Kansas; Georgia State Conference of the NAACP; Georgia Coalition for the People's Agenda; Marvin Brown; Joann Brown; and Project Vote.

The defendants in this court, who are appellees in this Court, are the U.S. Election Assistance Commission and Brian D. Newby in his official capacity as the Executive Director of the Election Assistance Commission.

The intervenors in the district court, who are appellees in this Court, are Kris W. Kobach, Secretary of State of Kansas; and the Public Interest Legal Foundation.

The Landmark Legal Foundation filed an amicus brief in district court.  In this Court, amicus briefs have been filed by Fair Elections Legal Network and by Asian Americans Advancing Justice, Asian Americans Advancing Justice – Atlanta, Asian Americans Advancing Justice – Asian Law Caucus, Asian Americans Advancing Justice – Chicago, Asian Americans Advancing Justice –

Los Angeles, American-Arab Anti-Discrimination Committee, Asian American Legal Defense and Education Fund, Campaign Legal Center, Common Cause, Dēmos, Mexican American Legal Defense and Education Fund, National Asian Pacific American Bar Association, National Association of Latino Elected and Appointed Officials Educational Fund, National Council of Jewish Women, People For the American Way Foundation, Service Employees International Union, and Southern Coalition for Social Justice.  Eagle Forum Education & Legal Defense Fund has indicated it will file an amicus brief in this Court.

### B.    Rulings Under Review

The ruling under review is the memorandum opinion and order issued by Judge Richard J. Leon on June 29, 2016, denying plaintiffs' motion for a preliminary injunction, district court docket numbers 92 and 93 [JA-1661, 1686]. The opinion can be located at *League of Women Voters of the United States v. Newby*, 2016 WL 3636604 (D.D.C. June 29, 2016).

### C.    Related Cases

The case has not previously been before this Court or any other court. Appellee is unaware of any other related cases that meets this Court's definition of related under Rule 28(a)(1)(C).

<u>s/ <em>Kris Kobach</em></u><br>
Kris Kobach

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vii

GLOSSARY ........................................................................................ xiv

INTRODUCTION ................................................................................. 1

ISSUES PRESENTED FOR REVIEW ................................................ 3

PERTINENT STATUTES .................................................................... 4

STATEMENT OF THE CASE.............................................................. 4

    I.    Kansas's Proof-of-Citizenship Law ........................................... 6

    II.   The Department of Justice Issues the EAC Decision .................. 7

    III.  Kansas Makes a Different Request for Modification of the Kansas-Specific Instructions of the Federal Form...................... 9

SUMMARY OF ARGUMENT .............................................................. 12

STANDARD OF REVIEW ................................................................... 15

ARGUMENT ........................................................................................ 15

    I.    The Required Showing for a Mandatory Preliminary Injunction Changing the Status Quo is Very High........................ 15

    II.   The Leagues Failed to Establish Irreparable Harm .................... 17

    III.  The Leagues Are Unlikely to Succeed on the Merits .................. 25

        A.   The Agency Decision is not Inconsistent with the NVRA. ............... 25

            1.   The Leagues Take the Word "Necessary" Out of Context ......... 25

            2.   The Supreme Court's Explanation of the Word "Necessary" ..... 27

iv

3.    An Objective Definition of Necessary is More Appropriate.......28

4.    The Agency's Interpretation Avoids Constitutional Doubt ........30

a.    The NVRA Would Override the States' Authority to Enforce Qualifications .........................................................31

b.    Separate State and Federal Voter Qualifications Would Exist ................................................................................34

5.    The Agency's Interpretation is Owed Deference ........................37

B.    The Executive Director's Decision was Compelled by Federal Rule.............................................................................................38

C.    The Executive Director's Decision was not Inconsistent with Procedural Requirements of the Statute or any EAC Procedure ........39

D.    Notice and Comment Rulemaking on State-Specific Instructions Was Not Required ...............................................................44

E.    The EAC's Course was Clear from its Decision.................................46

F.    There was no Prior "Policy" of EAC Opposition to Proof-of-Citizenship Requirements ...................................................53

IV.  The Leagues Fail to Establish that the Equities or Public Interest Favor an Affirmative Preliminary Injunction .........................................................55

V.   Remand Would be the Appropriate Remedy if the Court Finds That the District Court Abused Its Discretion...........................................................59

CONCLUSION ...........................................................................................61

CERTIFICATE OF COMPLIANCE.....................................................................63

ANDENDUM

# TABLE OF AUTHORITIES

*Cases*

*AFL-CIO v. FEC*, 333 F.3d 168 (D.C. Cir. 2003) ........................................ 37

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................. 60

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ..................................... 29

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    133 S. Ct. 2247 (2013) ........................................................ *passim*

*Auer v. Robbins*, 519 U.S. 452, 117 S. Ct. 905 (1997) ........................... 43, 44

*Califano v. Sanders*, 430 U.S. 99 (1977) ...................................................... 48

*Camp v. Pitts*, 411 U.S. 138 (1973) .............................................................. 47

*Carrington v. Rash*, 380 U.S. 89 (1965) ....................................................... 33

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...................................... 23-25, 60

*Consarc Corp. v. U.S. Treasury Dep't, Office of Foreign Assets Control*,
    71 F.3d 909 (D.C. Cir. 1995) ................................................. 44

*Chevron USA Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .................................................. 37, 44, 53

*Christopher v. SmithKline Beecham Corp.*,
    132 S. Ct. 2156 (2012) ......................................................... 43

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................ 48, 60

*City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863 (2013) ..................... 29, 40

*Clark v. Martinez*, 543 U.S. 381 (2005) ...................................................... 30

*Crawford v. Marion County,* 553 U.S. 181 (2008)......................................58

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009).............................................................15

*Decker v. Nw. Environ. Def. Ctr.*, 133 S. Ct. 1326 (2013)..........................44

*Dunn v. Board of Com'rs of Morton County*,
    165 Kan. 314 (1948)...............................................................................35

*Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014).....................21

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).....................30

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)............37

*Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111 (1947)...........40

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015)..................................15

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009)..............................................................61

*International Internship Program v. Napolitano*,
    718 F.3d 986 (D.C. Cir. 2013)..............................................................45

*Kobach v. Election Assistance Commission*,
    6 F. Supp. 3d 1252 (D. Kan. 2014)......................................................7, 9

*Kobach v. Election Assistance Commission*,
    772 F.3d 1183 (10th Cir. 2014),
    cert. denied 133 S. Ct. 2891 (2015)...................................9, 39, 40, 45, 53

*Kowalski v. Tesmer*, 543 U.S. 125 (2004)....................................................21

*Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. N.L.R.B.*, 603 F.2d 862, 870 (D.C. Cir. 1978) *opinion adhered to on denial of reh'g*, (D.C. Cir. June 20, 1979).............................................................55

*Local 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen*

*v. N.L.R.B.*, 546 F.2d 989, 992 (D.C. Cir. 1976) .................................... 48

*League of Women Voters v. Newby*,
No. 1:16-cv-00236-RJL (D.D.C. June 29, 2016) .................................... 12

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .................................................. 59

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)................................................ 15

*Menkes v. Dep't of Homeland Sec.*,
486 F.3d 1307 (D.C. Cir. 2007).......................................................... 47, 48

*Michigan v. EPA*, 576 U.S. ___
(Nos. 14-46, 14-47, and 14-49, June 29, 2015) .................................... 61

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)................... 17

*Munaf v. Geren*, 553 U.S. 674 (2008) .......................................................... 16

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007).......................................................................... 47

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005)............................................................................... 37

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................... 16

*Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325 (D.C. Cir. 1989) ....... 48

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*,
134 S. Ct. 506 (2013).............................................................................. 58

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) .............................................. 57

*Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593 (D.C. Cir. 2007) .................. 48

*Serafyn v. F.C.C.*, 149 F.3d 1213 (D.C. Cir. 1998) .................................... 29

*Seven Star, Inc. v. United States*, 873 F.2d 225, 227 (9th Cir. 1989).......... 55

*Shelby County, Ala. v. Holder*, 133 S. Ct. 2612 (2013)................................ 33

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)...................................... 17

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981) .................................. 43

*State v. Butts*, 31 Kan. 537 (1884) ................................................................ 35

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007).............. 43

*Third Nat. Bank v. Stone*, 174 U.S. 432 (1899) ........................................... 55

*U.S. Telecomm. Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) .................... 40

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ........................... 33

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) ............................ 29

*United States Sugar Corp. v. EPA*,
     D.C. Cir. No. 11-1108 (July 29, 2016) .................................................. 61

*Van Hollen, Jr. v. FEC*, 811 F.3d 486 (D.C. Cir. 2016).............................. 37

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
     636 F.3d 650 (D.C. Cir. 2011)................................................................ 38

*White Stallion Energy Center LLC. v. EPA*,
     D.C. Cir. No. 12-1100 (Dec. 15, 2015) .................................................. 61

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............... 16, 17

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ............... 23, 24

*Young v. Fordice*, 520 U.S. 273 (1997) .......................................................... 4

**Constitution and Statutes**

U.S. Const., Article I, § 2, cl. 1 ........................................................ 26, 32, 25

U.S. Const. Article I, § 4, cl. 1 ................................................................ 31

U.S. Const. XVII Amen. ............................................................ 32, 35, 36

5 U.S.C. § 553 ............................................................................................. 44

5 U.S.C. § 706(2) ....................................................................................... 48

5 U.S.C. § 706(2)(A) ................................................................................. 60

42 U.S.C. § 1973gg ..................................................................................... 4

52 U.S.C. § 20501 ....................................................................................... 4

52 U.S.C. § 20503(a) ................................................................................. 4

52 U.S.C. § 20505(a)(1) ..................................................................... 5, 30

2 U.S.C. § 20505(a)(1) ..................................................................... 52, 53

52 U.S.C. § 20507(a)(1) ............................................................................ 1

52 U.S.C. § 20508 ..................................................................................... 25

52 U.S.C. § 20508(a)(2) ............................................................... 1, 5, 26

52 U.S.C. § 20508(b)(1) ................................................................... *passim*

52 U.S.C. § 20508(b)(2) ............................................................................ 5

52 U.S.C. § 20921 ....................................................................................... 4

52 U.S.C. § 20921(a)(1) ............................................................................ 4

52 U.S.C. § 20928 ............................................................................... 40, 54

52 U.S.C. § 21132 ....................................................................................... 4

Kan. Const., art. 5, § 1 ............................................................... 35

Kan. Const., art. 5, § 4 ............................................................... 35

K.S.A. § 25-2309(l) ............................................. 6, 17, 22, 35, 36

K.S.A. § 25-2309(m) ..................................................... 6, 10

K.S.A. § 25-2309(t) ........................................................... 22

## *Regulations*

11 C.F.R. § 9428.4 ..................................................................... 5

11 C.F.R. § 9428.4(b)(1) ................................................ 6, 38, 53

11 C.F.R. § 9428.6(a)(1) ................................................... 1, 6, 38

11 C.F.R. § 9428.(c) ......................................................... 1, 6, 38

59 Fed. Reg. 32,311 (June 23, 1994) ......................................... 5

K.A.R. § 7-23-15 ................................................................. 9, 10

K.A.R. 7-23-15(b) ................................................................... 22

*Nat'l Voter Registration Act of 1993*,
    59 Fed. Reg. 11 (Mar. 10, 1994) ...................................... 46

*Nat'l Voter Registration Act*,
    58 Fed. Reg. 51 (Sept. 30, 1993) ...................................... 46

## *Other Sources*

Black's Law Dictionary (10th ed. 2014) ..................................... 29

Federal Election Commission "Record" Vol. 28,

No. 8 at 1 n.1 (August 2002) *available at*
http://www.fec.gov/pdf/record/2002/aug02.pdf. ......................................... 42

Hans von Spakovsky, "New Myths on Voter ID," National Review (Oct. 13,
2011), *available at* http://www.nationalreview.com/corner/279991/new-myths-
voter-id-hans-von-spakovsky......................................................................... 22

*Notice and Request for Public Comment on State Requests To Include Additional
Proof-of-Citizenship Instructions on the National Mail Voter Registration Form*,
78 Fed. Reg. 77 (December 24, 2013)........................................................... 45

The Federalist No. 52 (Madison) .................................................................. 35

The Federalist No. 60 (A. Hamilton).............................................................. 32

# GLOSSARY

EAC – Election Assistance Commission

FEC – Federal Election Commission

NVRA – National Voter Registration Act

# INTRODUCTION

The United States Election Assistance Commission ("EAC") maintains a Federal Voter Registration Application Form ("Federal Form") for elections for Federal office. 52 U.S.C. § 20508(a)(2). States "ensure that any eligible applicant" who timely submits the Federal Form "is registered to vote." *Id.* § 20507(a)(1). The Federal Form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary *to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process*." *Id.* § 20508(b)(1)(emphasis added).

The state-specific instructions accompanying the Federal Form are eighteen pages long. They contain directions regarding specific voter registration requirements imposed by the laws of the particular States. Governing regulations direct state election officials to notify the EAC of their State's voter registration eligibility requirements reflected in their state laws, and to notify the EAC on an ongoing basis of any changes to those requirements. 11 C.F.R. § 9428.6(a)(1), (c). Since the creation of the Federal Form the vast majority of these state-specific changes have been approved informally by the Executive Director of the EAC, without any Administrative Procedure Act ("APA") notice and comment, and

without any EAC explanation (written or verbal) of why it granted the State's request.

In the instant case, Kansas requested a change in the Kansas-specific instructions to conform with a Kansas law requiring documentary proof of citizenship to complete an applicant's registration.  JA-859.  The Executive Director of the EAC changed the Kansas-specific instructions at the request of the State of Kansas, effective February 1, 2016.  The Executive Director simultaneously changed the state-specific instructions of Alabama and Georgia to require documentary proof of citizenship, in response to requests from those States. JA-892.[1]

The League of Women Voters of Kansas, Alabama, and Georgia, as well as the League of Women Voters of the United States ("the Leagues") sought a mandatory preliminary injunction to compel the EAC and its Executive Director to revoke the decision granting the States' requests and to alter the State-specific instruction to remove the proof-of-citizenship requirements.  The district court denied preliminary injunctive relief, holding that the Leagues did not establish any irreparable harm.  The district court did not reach the other requirements for the issuance of a mandatory preliminary injunction.  The Leagues now appeal.  JA-

---

[1] Four States currently require proof of citizenship to register to vote.  The fourth is Arizona.

1686.  The district court has ordered the parties to file cross-motions for summary judgment and has scheduled a hearing on such motions on September 12, 2016.

Accordingly, this appeal is about whether the Leagues have established the required elements for a mandatory preliminary injunction to compel the EAC to remove statements from the State-specific instructions that are consistent with State law requiring documentary proof of citizenship.  This case is *not* about the validity of the Kansas proof-of-citizenship law or about any change in the text of the Federal Form itself, but only about a request to alter the state-specific instructions.  Finally, the Leagues do not seek to preserve the status quo; rather they seek to return to the status quo *ante*, prior to February 1, 2016.

### ISSUES PRESENTED FOR REVIEW

1.  Whether the Leagues demonstrated irreparable harm.

2.  Whether the Leagues demonstrated a likelihood of success on any claim made in their Complaint.

3.  Whether the Leagues demonstrated that the balance of the equities and the public interest require a mandatory preliminary injunction compelling the EAC to take affirmative steps.

## PERTINENT STATUTES

The pertinent statutes are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

The National Voter Registration Act ("NVRA") of 1993, 42 U.S.C. § 1973gg, *et seq.*, *recodified at* 52 U.S.C. § 20501 *et seq*,[2] "requires States to provide simplified systems for registering to vote in *federal* elections." *Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 133 S. Ct. 2247, 2251 (2013)(quoting *Young v. Fordice*, 520 U.S. 273, 275 (1997)(internal quotations omitted)). The NVRA requires States to permit individuals to apply to register to vote "by any of three methods: simultaneously with a driver's license application, in person, or by mail." *ITCA*, 133 S. Ct. at 2251 (quoting 52 U.S.C. § 20503(a)). The "by mail" registration can be done through a state-created form or through the Federal Form.

Congress subsequently created the Election Assistance Commission (EAC), *see* 52 U.S.C. §§ 20921, 20923(a)(1), and transferred from the Federal Election Commission (FEC) responsibility for implementing the relevant provisions of the National Voter Registration Act. *Id.* at § 21132. Congress requires the EAC, "in consultation with the chief election officers of the States," to "develop a mail voter

---

[2] The Secretary cites to the recodified sections of the NVRA.

registration application form for elections for Federal office."  52 U.S.C. §

20508(a)(2).  The statutes require also that "[e]ach State shall accept and use the

mail voter registration application form prescribed by the [Commission]."  *Id.* §

20505(a)(1).

Congress specified that the Federal Form "may require only such identifying

information (including the signature of the applicant) and other information

(including data relating to previous registration by the applicant), *as is necessary* to

enable the appropriate State election official *to assess the eligibility of the*

*applicant and to administer voter registration and other parts of the election*

*process*."  52 U.S.C. § 20508(b)(1)(emphasis added).  The form must, however,

"include a statement that . . . specifies each eligibility requirement (including

citizenship)."  *Id.* § 20508(b)(2).  The required statement must also "contain[] an

attestation that the applicant meets each such requirement" and "require[] the

signature of the applicant, under penalty of perjury."  *Id.*

The FEC initially drafted the nationwide elements and layout of the Federal

Form (not including the content of the State-specific instructions) through notice-

and-comment rulemaking.  *See* 11 C.F.R. § 9428.4; 59 Fed. Reg. 32,311-32,325

(June 23, 1994).  The FEC also promulgated regulations that now bind the EAC.

The relevant rule mandates that the application "*shall* list U.S. Citizenship as a

universal eligibility requirement and *include a statement that incorporates by*

*reference each state's specific additional eligibility requirements*... as set forth in the accompanying state instructions." 11 C.F.R. § 9428.4(b)(1)(emphasis added). The regulations mandate that the state-specific instructions must include each State's eligibility requirements, and they provide for State election officials to notify the EAC of any changes in State requirements. *Id*. § 9428.6(a)(1), (c). Neither the FEC nor the EAC has proposed or promulgated State-specific instructions as regulations.

## I.     Kansas's Proof-of-Citizenship Law

In 2011, Kansas enacted the "Secure and Fair Elections Act." The law requires an applicant to provide evidence of United States citizenship to complete an application to register to vote. "The county election officer or secretary of state's office shall accept any completed application for registration, but an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship." K.S.A. § 25-2309(l). The law enumerates thirteen different documents that constitute satisfactory evidence of citizenship. *Id.* Those applicants who do not possess any of the listed documents can provide any other evidence of citizenship to the State Election Board through an informal hearing, often conducted by telephone. K.S.A. § 25-2309(m). The proof-of-citizenship requirements took effect on January 1, 2013. Kansas modified its state

voter registration forms accordingly and sought to modify its state-specific instructions on the Federal Form.

In *ITCA*, the Supreme Court had suggested that Arizona renew its request to the Election Assistance Commission's ("EAC") to modify the federal form to require proof of citizenship in the Arizona-specific instructions. 133 S. Ct. at 2260. Following *ITCA*, Kansas and Arizona requested in 2013 that the EAC modify the state-specific instructions of the Federal Form to reflect their respective proof-of-citizenship requirements. At that time, the EAC lacked any commissioners and lacked an executive director. The Acting Executive Director Alice Miller responded that she therefore could not act on the States' requests. The States sued in the United States District Court for District of Kansas. *Kobach v. Election Assistance Commission*, 6 F. Supp. 3d 1252 (D. Kan. 2014).

## II.    The Department of Justice Issues the EAC Decision

After the district court ruled that the EAC must answer the States' requests, the Acting Executive Director went beyond the district court's order and took the unprecedented step of first asking for public comments before responding to the States' request. *Never before had the EAC asked for public comment on any state request for modification of the state-specific instructions of the Federal Form.*

MATERIAL UNDER SEAL DELETED

It has since been revealed why this unprecedented procedure was used, in contrast to the "informal" process traditionally taken by the EAC in making modifications to the State-specific instructions of the Federal Form. *ITCA*, 133 S. Ct. at 2260, n.10. Rather than following the previous practice of routinely modifying the state-specific instructions, Acting Executive Director Alice Miller handed the reins to the Department of Justice. As she subsequently stated to EAC Executive Director Brian Newby, "the Department of Justice issued the opinion." JA-292. With the EAC lacking commissioners or a duly-appointed executive director, the partisan Department of Justice was able to commandeer the empty ship. What was supposed to be a decision of a bipartisan, independent EAC was instead issued by a partisan Department of Justice. Indeed the Justice Department actually *drafted* the decision that was presented as a decision of the EAC. Trans. of Temporary Inj. Hearing, Dist. Dkt. No. 37, pp 59-61; JA-292.[3] ███████

███████████████████████████████████████████████████████

███████████████████ Kansas and Arizona were not informed at the time that the Justice Department had commandeered the EAC for the purpose of denying their requests.

After the States' requests were denied, they renewed their demand for relief in the district court. The district court reversed the Acting Executive Director's

_____

[3] ████████████████████████████████████████████████████

denial. *Kobach v. Elections Assistance Commission*, 6 F. Supp. 3d at 1271. The

Tenth Circuit reversed, concluding that the EAC had discretion, and therefore the

authority, to deny the States' requests. *Kobach v. Election Assistance Commission*

("*EAC*"), 772 F.3d 1183, 1196 (10th Cir. 2014), cert. denied 133 S. Ct. 2891

(2015).

## III.   Kansas Makes a Different Request for Modification of the Kansas-Specific Instructions of the Federal Form

In the year after Tenth Circuit's decision on November 7, 2014, several

significant developments occurred. First, the United States Senate confirmed a

quorum of commissioners on the EAC. Second, those Commissioners appointed

Brian Newby to the post of Executive Director of the EAC. Third, Kansas

promulgated regulations stipulating that applicants would have 90 days to

complete their applications by providing proof of citizenship to the relevant county

election office. Failure to do so would result in the "cancellation" of the

application record, but the applicant was free to fill out the application once again

as often as he wished and give himself another 90 days to provide proof of

citizenship. K.A.R. § 7-23-15.

On November 17, 2015, Kansas requested instruction language significantly

different from language requested in 2013. Specifically, the new language (1)

included the 90-day limit imposed  by K.A.R. § 7-23-15, (2) listed the thirteen

acceptable documents under Kansas law that constitute sufficient evidence of

citizenship, and (3) notified applicants of their right under K.S.A. § 25-2309(m) to

submit other evidence of citizenship.  JA-859.

   In addition, the Secretary provided to the EAC a spreadsheet of eighteen

cases of aliens who had either successfully registered to vote prior to Kansas's

proof of citizenship requirement, or who had been successfully prevented from

registering after the law went into effect.  All but one of these cases were newly

discovered and had not been presented to the district court in 2013 or the EAC's

Acting Executive Director in 2014.

   On January 29, 2015, EAC Executive Director Brian Newby granted

Kansas's requested modification of the state-specific instructions of the Federal

Form, along with similar requests by the States of Georgia and Alabama.  JA-896.

The Executive Director issued a written memorandum explaining in detail the basis

for the decisions.  *See* JA-795-819.  The EAC posted revised State-specific

instructions on its website on February 1, 2016.  JA-788, 793-94.

   For six months, Kansas has been operating under the revised instructions.

The State has accepted a total of 62,992 applications to register to vote in that time

span.[4]  Now that the instructions on the Federal Form conform to the instructions on the state form, the administration of elections in the State of Kansas has become significantly less difficult; and a loophole through which noncitizens could register has been closed.  The State now treats all registration forms in the same way and need not administer a separate process for Federal Form applicants who decline to provide proof of citizenship.

The Leagues sued Executive Director Newby in his official capacity, as well as the EAC itself, on February 12, 2016.  The Leagues challenge three separate decisions granting changes in the State-specific instructions for Alabama, Georgia, and Kansas.  JA-27.  On February 17, 2016, the Leagues moved for a temporary restraining order and preliminary injunction seeking reversal of the changes to the Federal Form on the EAC website, affirmatively ordering that defendants immediately withdraw the January 29, 2016, letters issued to Alabama, Georgia and Kansas, and affirmatively requiring the EAC to instruct election officials in those states to replace any copies of the Federal Form that contained the changes.

The district court heard argument on the motion for temporary restraining order on February 22, 2016, and required defendants to submit any written

---

[4] As calculated by the State of Kansas Election Voter Information System ("ELVIS") database on August 1, 2016.  This number reflects the total number of registration applications received from February 1, 2016, through July 31, 2016, inclusive.

response.  As the district court noted, "Astonishingly, instead of submitting an opposition, [the Department of Justice] submitted their written *consent* to the entry of a preliminary injunction!" *League of Women Voters v. Newby*, No. 1:16-cv-00236-RJL (D.D.C. June 29, 2016), JA-1671(emphasis in original).  On the same day, the Secretary of State of Kansas and Public Legal Interest Foundation filed motions to intervene as defendants, which the district court granted.  *See Id.*

After briefing and oral argument, the district court denied the Leagues' Motion for a temporary restraining order on February 23, 2015, and reserved judgment on the propriety of a preliminary injunction.  JA-320.  The district court heard argument on the preliminary injunction motions on March 4, 2016, and the parties submitted supplemental briefing on March 21, 2016.  The district court denied the preliminary injunction on June 29, 2016, JA-1661, 1686, from which the Leagues now appeal.

The district court has scheduled a hearing on the motions for summary judgment on September 12, 2016.  Dist. Dkt. No. 99.  All motions and responses must be filed with the district court by September 2, 2016.

## SUMMARY OF ARGUMENT

The Leagues sought a mandatory preliminary injunction that would alter the status quo and afford them all of the relief that they could obtain after summary

judgment; but after multiple briefings and hearings, they failed to establish the elements for such extraordinary relief. The Supreme Court has made clear that injunctions are extraordinary remedies and a matter of equitable discretion that should only be granted when a plaintiff establishes all four elements necessary for a preliminary injunction. The Court's articulation of the mandatory factors compels the elimination of the "sliding scale."

The Leagues failed to establish that they will suffer irreparable harm from the inclusion of the proof-of-citizenship requirement in the Kansas-specific instructions of the Federal Form. The documentation requirement has applied to Kansas state registration forms since 2013. The only harms that the Leagues alleged were, effectively, that the additional requirement for registration using the Federal Form reduces the effectiveness of the Leagues voter registration efforts, and that the League would have to explain the requirement to voters. But the district court found that Leagues expended a minimal amount to prepare educational material and that the net effect of the change was nil, since the League would have to explain the relevant requirements no matter what they were.

The Leagues also failed to establish that they are likely to succeed on the merits of any of their claims that the Executive Director's decision granting the change in Kansas-specific instructions clearly violates any statute or exceeds his authority. On the contrary, the decision was not inconsistent with any statute or

any promulgated regulation; and the decision is due deference at several different levels.  The Leagues are simply wrong in alleging that approval of a change in the Kansas-specific instructions requires Administrative Procedure Act ("APA") notice and comment rulemaking.

The Leagues also failed to establish that the equities or the public interest favor issuance of a preliminary injunction.  In short, the district court did not abuse its discretion in declining to issue a preliminary injunction that would have required both the EAC and the State of Kansas to take affirmative steps.

The Department of Justice ("DOJ") assumes the highly-unusual posture of refusing to defend a federal agency.  It erroneously claims that, not only did the EAC and the district court err, but also this Court should adjudicate all of the Leagues' claims, and the Leagues should be granted a preliminary injunction. Even if this Court agreed with the Department of Justice that both the EAC and the district court erred (and the court abused its discretion), the proper remedy would be remand to the district court for consideration of the remaining preliminary injunction factors and for possible remand to the EAC for further explanation of its decision.  The Department of Justice thus seeks the most extraordinary of extraordinary relief.

Accordingly, this Court should affirm the decision of the district court and permit that court to consider the merits on cross motions for summary judgment

pursuant to its scheduling order and scheduled oral argument on September 12, 2016.  That adjudication will occur nearly contemporaneously with this court's consideration of the instant appeal (rendering a preliminary injunction largely pointless).

## STANDARD OF REVIEW

This Court reviews the district court denial of a preliminary injunction for abuse of discretion and reviews the district court's legal conclusions *de novo*. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).

## ARGUMENT

### I.     The Required Showing for a Mandatory Preliminary Injunction Changing the Status Quo is Very High

The Leagues have sought an affirmative (mandatory) preliminary injunction commanding the EAC to take specific steps and, by effect of law, commanding three States to likewise take steps to implement the changed EAC decision. Mandatory preliminary injunctions are disfavored as they seek relief beyond maintaining the *status quo pendente lite*, and will only be ordered when the law and facts clearly favor the moving party.  *See*, *e.g*., *Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015).  As the district court noted, this Circuit has not yet

15

addressed whether a mandatory injunction requires a higher burden of proof than a traditional preliminary injunction to preserve the *status quo*. JA-1672 n.13. This case need not resolve that question if this Court determines that the Leagues have failed to establish the basic requirements for a prohibitory preliminary injunction.

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)(per curiam)(citation omitted). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, he is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in his favor, and an injunction serves the public interest. *Winter*, 555 U.S. at 20. The traditional inquiry into balancing of equities and the public interest may merge when the United States is a party defendant, at least with regard to a stay. *See Nken v. Holder*, 556 U.S. 418 (2009).

The district court recognized that this Court has suggested, but has not decided, that *Winter* should be read to abandon the "sliding scale" that this Court has used in the past in evaluating the preliminary injunction factors. JA-1672 n.14

16

(quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The Leagues argue that a sliding scale should continue to permit them to make a lesser showing of irreparable harm under *Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009). As *Sherley* suggests, *Winter* does not support the continued use of any lesser standard for any of the independent factors. The Leagues must establish *each* of the four factors independently as a threshold for the Court to exercise discretion; and because the Leagues seek a *mandatory* injunction, their burden is even greater. As the League has failed to demonstrate any one of the factors, this Court may affirm the district court decision on that basis alone.

## II.    The Leagues Failed to Establish Irreparable Harm

The Leagues base their tenuous claim of irreparable harm on the standard that any infringement on the right to vote creates an irreparable harm.[5] The right to vote, however, is not the issue in this case. The issue here is the Leagues' alleged inconvenience stemming from the change in the State-specific instructions on the Federal Form, and how it affects the Leagues' efforts assisting applicants to register to vote. The proof-of-citizenship requirement in KSA § 25-2309(l) has

---

[5] Although the Appellants include individuals Marvin Brown and Joanne Brown, both registered prior to the change in the federal form instruction on February 1, 2016. JA-1681. Consequently, they are in no way affected by the EAC decision at issue in this case. Appellants do not dispute this fact. Accordingly, they lack standing.

been in place since January 1, 2013.  The harm to the League is the loss of the

distinction between Federal-Form and state-form registrants, if it is a loss at all.

The Leagues have failed to establish that they will suffer irreparable harm

from the EAC's approval of the States' requests.  The Leagues have only identified

a minimal burden associated with informing applicants of the requirements to

register in Kansas.[6]  But those burdens flow from the Kansas statutory requirement

that individuals provide proof of citizenship to register to vote when they use state

registration forms or seek to vote in state elections using the Federal Form—not

from the change in Kansas-specific instructions attached to the Federal Form.  It

should also be noted that the Federal Form is used in less than one percent of all

voter registrations in Kansas.

The only factual allegations of concrete injury appear to come from the

Declaration of Dolores Furtado, past President of the League of Women Voters of

Kansas.  JA-204 et seq.  Ms. Furtado avers that a number of changes have occurred

in the Leagues' voter registration drives in Kansas as a result of the 2013 Kansas

statute.  ¶¶ 19-26, JA-209-11.  During that period, Ms. Furtado asserts "the League

was using both state and federal forms in registration drives, but was less likely to

use the Federal Form because of concerns that applicants would be able to vote in

---

[6] And they have not even asserted, much less demonstrated, that the state-specific instructions of the Federal Form are inadequate to educate voters.

federal elections only." ¶ 29, JA-211.[7]  The Furtado Declaration acknowledges a central problem in the League's assertion of irreparable harm—the League wants voters to be eligible to vote in *both* state and federal elections.  *See* JA-717-718; 1681-1682.  Consequently, the League seeks to encourage applicants to provide proof of citizenship so that they can vote in *both* state and federal elections, not just federal elections which is all that the Federal Form prior to February 1, 2016, accomplished.[8]

This is fatal to their assertion of irreparable harm.  As the district court correctly noted, "[r]egardless of the outcome of this litigation [the Leagues] will have to endeavor to help eligible citizens understand and comply with the documentation of citizenship requirement in order to be certain those citizens are

---

[7] There exists some question regarding whether Ms. Furtado's declaration reflects the facts.  The current president of the Kansas League, in a sworn deposition, stated that, "The League of Women Voters of Kansas as a State organization does not conduct voter registration drives."  Deposition of Marge Ahrens, 90:4-6 (June 8, 2016), *Fish v. Kobach*, D. Kan. Nos. 16-cv-2105, 15-cv-9300, filed at D.C. Cir. No. 16-5196, Doc. No. 1624047 (filed July 11, 2016).  Thus, the Kansas League may not even have suffered any "voter registration activities" harm.

[8] On June 29, 2016, a Kansas District Court issued a temporary restraining order barring Kansas from using a "partial provisional" ballot mechanism to prevent someone who is entitled to vote for federal offices, but did not provide proof of citizenship, from voting for state offices.  A hearing is scheduled for September 21, 2016, on whether the State may use this mechanism.  If anything, this temporary restraining order undermines the League's instant claim of harm.  Now, the League will have to provide even more caveats to potential registrants regarding whether they are registered to vote and explain the problems that could result depending on ongoing litigation.  The simplest solution for the League is actually the current Federal Form.

registered to vote in Kansas's state elections." JA-1682. The Leagues will continue to be helping people comply with the proof-of-citizenship requirement, regardless of the outcome of this litigation. In short, this "harm" is not tied to the wording of the Kansas-specific instructions.

Additionally, Ms Furtado avers that Kansas League members contributed more than $6,000 toward educational efforts and the Kansas League has spent $7,000 to develop a teaching module and video to distribute to colleges throughout Kansas. ¶¶ 38-39, JA-213. She speculates that the Kansas League "will likely spend thousands of dollars on producing and distributing additional instructional videos." *Id.* This claim is generalized and speculative; it is neither concrete nor particularized. *See* Leagues Br. at 23. More importantly, as the district court correctly noted below, *the League is going to be spending money educating voters either way.* JA-1680-83. All that changes is what the specific wording of those education materials is for the tiny fraction of voters who use the Federal Form.

The only difference between the Kansas League's past and present voter instruction efforts lies in the fact that the Kansas League will no longer need to distinguish between state and federal forms in terms of educating the public on registration requirements. If anything, the EAC's decision makes the League's educational task easier, since their educational materials no longer need to make this distinction. At no point does the League document or explain how this slight

20

change in the content of their materials creates any sort of burden.  Nor do they

demonstrate any connection between the instructions of the Federal Form and the

total number of voters that they are able to assist in registering.

Moreover, even if the League could establish a connection between the

wording of the Kansas-specific instructions and the total number of people who

complete their registration by providing proof of citizenship, they cannot assert

that they are harmed by the decisions of other people to register or not.  Appellants

have no legally-cognizable interest in whether or not some unnamed, hypothetical

individual chooses to register and whether or not that individual meets the State's

qualifications for registering to vote.  "The plaintiffs are organizations and cannot

vote; instead they assert the right to vote of individuals not even presently

identifiable. A party 'generally must assert his own legal rights and interests, and

cannot rest his claim to relief on the legal rights or interests of third parties.'" *Fair

Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014)(quoting *Kowalski v.

Tesmer*, 543 U.S. 125 (2004)).

The United States League's claims of harm are so generalized as to apply to

*any* change in any State-specific instructions appended to the Federal Form; and

they are neither concrete nor particularized.  All other organizational plaintiffs

assert claims regarding EAC decisions other than relating to the changes in the

Kansas-specific instructions and have no claim of injury from the EAC decision

approving the Kansas-specific instructions.

The Leagues repeatedly make some generalized claims that warrant

debunking.  The Leagues contend that many eligible voters do not possess

citizenship documents or possess those documents at the places or times at which

Leagues operate voter registration drives.  E.g. JA-279, 286 – 87.  The obvious

problem with such claims remains that they depend on the place and time of the

League's choosing.  More importantly, Kansas law allows applicants to email, text,

fax, or mail in their proof of citizenship at any time up to 90 days after the

application is received.  K.S.A. § 25-2309(l) and (t); K.A.R. 7-23-15(b).  So it does

not matter if an applicant possesses his proof of citizenship at the time he fills out

an application during a League drive.[9]

The district court naturally began its analysis of plaintiffs' motion for a

preliminary injunction by focusing on whether plaintiffs had established

---

[9] The Leagues also cite a discredited Brennan Center study that allegedly shows individuals lack proof-of-citizenship documents.  Leagues Br. 46.  The accuracy of this study is in doubt.  *See* Hans von Spakovsky, "New Myths on Voter ID," National Review (Oct. 13, 2011), *available at* http://www.nationalreview.com/corner/279991/new-myths-voter-id-hans-von-spakovsky.  For example, the Brennan Center's 2006 "question about citizenship documentation asked whether respondents had access 'in a place where you can quickly find it if you had to show it tomorrow,' even though elections are not scheduled on such a short-term basis. This was obviously intended to skew the results." *Id.*

irreparable harm. "A movant's failure to show any irreparable harm is… grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The district court found that the Leagues' claimed irreparable harms did not in fact constitute any cognizable injury:

> The modification of the Federal Form to include the state-specific documentation of citizenship requirements, although an inconvenience, in no way *precludes* the organizational plaintiffs and their members from conducting their core activities or encouraging civic participation in both state and federal elections and educating the public about the requirements for registering to vote in each.

JA-1681. The Leagues fail to explain why the district court's factual finding in this regard should be displaced.

This Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. "First, the injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)(per curiam)). To meet this standard, the injury must be "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation omitted). "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur." *Wisconsin Gas Co.*, 758 F.2d at 674 (emphasis in original).

Importantly, this Court has already rejected the sort of injuries asserted by the Leagues:

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisconsin Gas Co.*, 758 F.2d at 674). Monetary loss that threatens the very existence of the plaintiff's business may constitute irreparable injury, but the Leagues' inconvenience in rewriting their instructional materials does not. They cannot establish economic loss, since they would be distributing such materials regardless of the content of the Federal Form instructions. But even if they could show economic loss, it would not suffice to establish irreparable harm. See *Davis*, 571 F.3d at 1295; see also *Wisconsin Gas*, 758 F.2d at 674 ("It is… well settled that economic loss does not, in and of itself, constitute irreparable harm."). The Leagues have not shown any economic loss that is great, certain and imminent. Nor have they even attempted to demonstrate the irreparability of this "harm."

Finally, should this Court conclude that the district court erred regarding irreparable harm—the sole issue that the district court addressed in denying the preliminary injunction—the proper remedy is remand to the district court to allow it to consider the remaining preliminary injunction factors, including likelihood of

success.  *Chaplaincy of Full Gospel Churches*, 454 F. 3d at 305.  Nonetheless, the

Leagues' brief requires response to all preliminary injunction issues; and the

Department of Justice argues that the Court should decide all other issues (but

never addresses irreparable harm), thereby requiring Kansas to respond to those

claims.


**III.    The Leagues Are Unlikely to Succeed on the Merits**


**A.    The Agency Decision is not Inconsistent with the NVRA.**

The Leagues attempt to construct a false standard that must be met in order

for the state-specific instructions to be changed. This fictitious edifice comes from

the word "necessary" in the NVRA.  Leagues Br. 38-41; *see also* DOJ Br. 17-18.

However, this standard was never applied until the Department of Justice

commandeered the EAC and *invented* the standard in 2013-14.  It is an incorrect

interpretation of the law.


1.    The Leagues Take the Word "Necessary" Out of Context

The word "necessary" comes from the section of the NVRA describing

"federal coordination" with the States in developing the Federal Form.  52 U.S.C. §

20508.  Specifically, Federal Form may only require "such… information… as is

25

necessary to enable the appropriate State election official to assess the eligibility of the applicant and *to administer voter registration and other parts of the election process*….” 52 U.S.C. § 20508(b)(1)(emphasis added).  The Leagues obfuscate the fact that there are *two* justifications for why requested instructions may be necessary, and they ignore the second one italicized above.  Something is necessary *either* if it helps assess eligibility *or* if enables the State election official to “administer [the] voter registration and… election process.”  That election process is defined by state law.  The job of the EAC is to make sure that the Federal Form reflects state law by “consult[ing]” the chief election officers of the States and including any changes in the state-specific instructions of the Federal Form that are reflected in new state laws.  52 U.S.C. § 20508(a)(2).

Moreover, since it would violate Article I, Section 2 of the United States Constitution if the requirements for voting in federal elections differed from the requirements for voting in state elections, the only reasonable reading of this sentence is one that allows the state officials to determine what information is necessary to comply with their own voter registration laws.  The Leagues completely ignore this second reason why such information may be “necessary” to state election officials.

2.     The Supreme Court's Explanation of the Word "Necessary"

The Leagues attempt to read the law in a manner that the text cannot bear. They declare that the EAC *must* require a State to prove necessity before modifying the state-specific instructions in response to a State's request.

However, the Supreme Court has already weighed in on this subject. And its reading of the NVRA is very different: "a State may request that the EAC alter the Federal Form to include information *that the State deems necessary* to determine eligibility…." *ITCA*, 133 S. Ct. at 2259 (emphasis added). The Court made clear that the determination of necessity resides with the States, not the EAC. Moreover, the Court also considered the possibility that the EAC might decline to act. Even under those circumstances, the relevant State would not have to prove to the EAC that its requested modifications were "necessary." Rather, the State should simply sue and establish that mere oath will not suffice: "Should the EAC's inaction persist, Arizona would have the opportunity to *establish in a reviewing court that mere oath will not suffice* to effectuate its citizenship requirement and that the EAC is therefore under a nondiscretionary duty to include Arizona's concrete evidence requirement on the federal form." *Id.* at 2260 (emphasis added).[10]

_____

[10] In addition, the Court suggested that it would be "arbitrary" for the EAC to refuse such a request: "Arizona might also assert (as it has argued here) that it would be arbitrary for the EAC to refuse to include Arizona's instruction when it has accepted a similar instruction requested by Louisiana." *ITCA*, 133 S. Ct. at 2260. Mr. Newby recognized the arbitrariness of the 2014 opinion as well. JA-791-792.

3.     An Objective Definition of Necessary is More Appropriate

Within the context of the NVRA, it is possible to define "necessary" either subjectively or objectively:

- The subjective definition:  "*Better than all other policy options, and without an adequate substitute policy*."

- The objective definition:  "*Required by state law*."

These definitions are quite different.  The former is a subjective judgment about good and bad policy choices when attempting to limit registration to citizens, whereas the latter is an objective statement of what state law requires.  The objective definition of "necessary" is correct for two reasons.  It is a more natural reading of 52 U.S.C. § 20508(b)(1), and it is more appropriately administered by an agency or court.

First, consider the wording of the statute.  The NVRA states that the Form may require information that is "necessary to *enable the appropriate State election official* to assess the eligibility of the applicant and *to administer voter registration and other parts of the election process*[.]"  52 U.S.C. § 20508(b)(1)(emphasis added).  The context of the sentence makes clear that whether something is necessary is defined by what the State election official is required to obtain *in order to comply with state law*.  That is the natural reading of "administering voter

28

registration and other parts of the election process."  Administering a process

entails complying with relevant laws.  This reading is consistent with the ordinary

meaning of "necessary":  "needed for some purpose or reason[.]"  Black's Law

Dictionary (10th ed. 2014), necessary.  The purpose or reason is to administer the

voter registration laws of the State.

Second, the objective definition of "necessary" is more capable of EAC

administration and subsequent judicial determination.  If the subjective definition

is used, then the EAC must wade into the policy realm and attempt to determine

whether the benefit of requiring proof of citizenship outweighs the costs of doing

so.  And any judicial review of the EAC's decision must also make a pure policy

judgment about the desirability of requiring proof of citizenship.  In so doing, the

court would have to assume the posture of a policy maker and second guess the

subjective policy judgments of the three States' legislatures.  These are policy

questions on which reasonable people may disagree.  Consequently they are

legislative (not legal) in nature and not appropriate for judicial determination.  *See*

*City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1881 (2013), *Am. Ins. Ass'n v.*

*Garamendi*, 539 U.S. 396, 427 (2003), *Usery v. Turner Elkhorn Mining Co.*, 428

U.S. 1, 18-19 (1976), and *Serafyn v. F.C.C.*, 149 F.3d 1213, 1217 (D.C. Cir. 1998).

Executive Director Newby appropriately applied the objective definition of the

word necessary, eschewing any second-guessing of the policy decisions of State

legislature.


> 4.     The Agency's Interpretation Avoids Constitutional Doubt

It is a fundamental rule of statutory construction that an Act of Congress

must not be construed in a manner that raises doubts as to its constitutionality.

*Clark v. Martinez*, 543 U.S. 381 (2005); *F.C.C. v. Fox Television Stations, Inc.*,

556 U.S. 502, 516 (2009).  The Supreme Court in *ITCA* pointed out that this was a

risk when interpreting the NVRA:  "Since the power to establish voting

requirements is of little value without the power to enforce those requirements,

Arizona is correct that *it would raise serious constitutional doubts if a federal*

*statute precluded a State from obtaining the information necessary to enforce its*

*voter qualifications*."  *ITCA*, 133 S. Ct. at 2258-2259 (emphasis added).  The Court

then considered the possibility that it would have to accept Arizona's less-

persuasive reading of the words "accept and use" in 52 U.S.C. § 20505(a)(1) in

order to avoid this constitutional doubt.  *ITCA*, 133 S. Ct. at 2259.  But the Court

found a way out.  "Happily, we are spared that necessity, since the statute provides

another means by which Arizona may obtain information needed for enforcement.

…[W]e are aware of nothing that prevents Arizona from renewing its request [to

the EAC]."  *Id.* at 2259-2260.  In other words, constitutional doubt could be

avoided if the EAC responded by granting a subsequent request from the State of Arizona to add proof of citizenship to the Arizona-specific instructions of the Federal Form.

In the instant case, the EAC's interpretation of 52 U.S.C. § 20508(b)(1) is consistent with the rule of avoiding constitutional doubt. The EAC has adopted a reading of the statute that does not "preclude a State from obtaining the information necessary to enforce its voter qualifications." *ITCA*, 133 S. Ct. at 2259. However, the Leagues urge this Court to force the agency to adopt a different reading of the statute—one that gives rise to severe constitutional doubt in two respects.

a.  The NVRA Would Override the States' Authority to
Enforce Qualifications

The first reason is that the Leagues' reading interprets the NVRA as overriding the State's constitutional authority to set the qualifications for electors. Article I, Section 4, clause 1, of the U.S. Constitution (the "Elections Clause") gives the States the initial authority to determine the time, places and manner of holding federal elections, but gives Congress the power to alter those regulations. *ITCA*, 133 S. Ct. at 2253. The Supreme Court recognized that "[t]he Election Clause's substantive scope is broad" enough to authorize regulations "relating to" registration. *Id.* at 2253. But the Court has emphatically limited what Congress

31

can do: "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them." *Id.* at 2257.

Instead, the Constitution gives the States the exclusive power to determine *who* may vote in federal elections. Article I, Section 2, clause 1 (the "Qualifications Clause") provides that the electors in each State for members of the House of Representatives "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." Likewise, the Seventeenth Amendment provides that the electors in each State for members of the Senate "shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."

Interpreting these provisions, *ITCA* concluded, "Surely nothing in these provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress." *ITCA*, 133 S. Ct. at 2258 (internal quotations omitted*)*. The Court therefore determined that "[p]rescribing voting qualifications ... 'forms no part of the power to be conferred upon the national government' by the Elections Clause." *Id.* (*quoting* The Federalist No. 60, at 371 (A. Hamilton)). Rather, the Court held that these constitutional provisions assign the power of establishing voter qualifications to the States. *ITCA*, 133 S. Ct. at 2258–59.

Importantly, "[s]ince the power to establish voting requirements is of little value without the power to enforce those requirements," the Court held that the

32

States also possess the exclusive power to *enforce* those voter qualifications. *Id.* at 2258–59. Indeed, all nine justices in *ITCA* agreed that the States have the exclusive power to both establish and enforce voter qualifications for federal elections. *ITCA*, 133 S. Ct. at 2258–59 (majority opinion); *Id.* at 2261 (Kennedy, J., concurring); *Id.* at 2262-64 (Thomas, J., dissenting); *Id.* at 2270-73 (Alito, J., dissenting).

In addition to the States' qualification power, the Supreme Court has elsewhere held, "States are thus entitled to adopt generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995)(internal quotation omitted). The "States have broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby County, Ala. v. Holder*, 133 S. Ct. 2612, 2623 (2013) (quotation marks and citation omitted). "The privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution." *Carrington v. Rash*, 380 U.S. 89, 91 (1965). Since the States possess the constitutional power to establish and enforce

voter qualifications for federal elections, the States' power can be limited only by the Constitution itself.[11]

Importantly for the purposes of the instant case, *ITCA* specifically held that it would raise serious constitutional doubts if the NVRA were interpreted to give the EAC the authority to reject Arizona's request to that agency to include Arizona's proof of citizenship instruction on the state-specific instructions the Federal Form:

> [W]e think that—by analogy to the rule of statutory interpretation that avoids questionable constitutionality—validly conferred discretionary executive authority is properly exercised (as the Government has proposed) to avoid serious constitutional doubt. That is to say, it is surely permissible if not requisite for the Government to say that necessary information which may be required [by the States] will be required [by the EAC].

*ITCA*, 133 S. Ct. at 2259. The Leagues completely ignore this central holding of *ITCA*. The EAC's decision to grant the States' requests in the instant case avoids an interpretation of "necessary" that would raise this constitutional doubt.

> b.    Separate State and Federal Voter Qualifications Would Exist

The second reason that the Leagues' reading of the NVRA raises constitutional doubt is that it creates a situation in which the qualifications for

---

[11] Notably, no party argues that the States' proof-of-citizenship laws are unconstitutional.

voting in federal elections in Kansas differ from the qualifications for voting in

State elections in Kansas.  It is undeniable that Article I, Section 2, of the United

States Constitution prohibits this.  The Constitution is "straightforward" regarding

the powers reserved to the States and the powers granted to the federal government

with respect to defining the federal electorate.  *ITCA*, 133 S. Ct. at 2251.  The

Qualifications Clause is unambiguous:  "the Electors in each State [for

congressional elections] shall have the Qualifications requisite for Electors of the

most numerous Branch of the State Legislature."  U.S. Const., Article I, § 2, cl. 1.

Equivalent words are found in the Seventeenth Amendment, with respect to the

qualifications of electors in elections for the United States Senate.  The Legislature

of Kansas has exercised its sovereign authority to make providing documentary

proof of citizenship a qualification for being an elector in state legislative elections.

K.S.A. 25-2309(l).  The standard of documentary proof of citizenship is

unquestionably a "standard ... which may be established … by the State itself."

The Federalist No. 52, at 326 (Madison).

     The State of Kansas has also made completion of the registration process,

itself, a qualification for being an elector.  "It is well settled in this state that the

legislature may require registration as a prerequisite to the right to vote."  *Dunn v.*

*Board of Com'rs of Morton County*, 165 Kan. 314, 327-28 (1948)(citing *State v.*

*Butts*, 31 Kan. 537 (1884)).  Qualified electors means "persons who have the

constitutional (Kan. Const., art. 5, §§ 1, 4) qualifications of an elector *and who are duly and properly registered*." *Id.* at 328 (emphasis added). One is not entitled to vote under Kansas law until one is a qualified elector; and becoming a qualified elector entails not only possessing the attributes of an elector (such as being a Unites States citizen), but also completing the registration process.

After the State has established its qualifications for being an elector, the federal government must accept such qualifications as the same qualifications of electors for congressional elections. *See ITCA*, 133 S. Ct. at 2258 ("voting qualifications in federal elections are [not] set by Congress"). There is no other plausible way to interpret the Qualifications Clause.

However, the Leagues urge a reading of the NVRA that would plainly violate the Qualifications Clause and the Seventeenth Amendment. The preliminary injunction that they seek would require that all Federal Form applicants be considered fully registered to vote for *federal elections*, even if those applicants had not provided documentary proof of citizenship. However, under Kansas law those applicants remain unqualified to participate in state and local elections. K.S.A. § 25-2309(l). The preliminary injunction sought by the Leagues would disrupt the constitutional plan of Article 1, Section 2, Clause 2, and the Seventeenth Amendment. The EAC avoided this problem by adopting a reading of 52 U.S.C. § 20508(b)(1) that is fully consistent with the United States Constitution.

36

This Court should not now adopt the Leagues' reading and give rise to the constitutional doubt that the EAC successfully avoided.

### 5.    The Agency's Interpretation is Owed Deference

In evaluating this statutory scheme under the traditional framework of *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), if the statute "can be read more than one way," *AFL-CIO v. FEC*, 333 F.3d 168, 173 (D.C. Cir. 2003)(citation omitted), or if the statute is "silent" regarding the relevant question, *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016), then the statutory ambiguity or silence is effectively deemed "'an implicit delegation from Congress to the agency to fill in the statutory gaps.'" *Id.* at 495 (quoting F*DA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)(emphasis omitted)).  Consequently, the court must "accept the agency's [reasonable] construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation[.]" *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 980 (2005)(citation omitted).  Such deference reflects the principle that the agency is "the authoritative interpreter (within the limits of reason)" of "an ambiguous statute [it] is charged with administering[.]"  *Id.* at 983.  Moreover, the nature of judicial review of an ambiguous statute under *Chevron* Step Two is "highly deferential."  *Vill. of*

*Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 667 (D.C. Cir. 2011)(citation omitted).

### B.  The Executive Director's Decision was Compelled by Federal Rule

The Leagues pointedly avoid mentioning the fact that the FEC promulgated a federal rule that is binding in the instant case.  The rule mandates that the Federal Form "*shall* list U.S. Citizenship as a universal eligibility requirement and *include a statement that incorporates by reference each state's specific additional eligibility requirements*... as set forth in the accompanying state instructions."  11 C.F.R. § 9428.4(b)(1)(emphasis added).  Presumably, the FEC used the word "shall" intentionally.  The rule does not permit the FEC (or its successor, the EAC) to second-guess which of a "state's specific additional eligibility requirements" are desirable ones and which requirements are unnecessary.  The regulations also provide for State election officials to notify the EAC of any changes in State requirements.  *Id.* § 9428.6(a)(1), (c).  This too, indicates the expectation that any changes in State requirements would be reflected in the State-specific instructions of the Federal Form.

Executive Director Newby's Memorandum regarding the approval of State-specific instructions is entirely consistent with this federal rule.  *See* JA-791.  Mr.

Newby explained that "changes to the instructions consistent with state law do not" fall under the term "policy" as defined by the Commissioners.  *Id.*  He pointed out the long-established "ministerial duty" of the Executive Director in changing the State-specific instructions of the Federal Form.  *Id.*  Neither the Leagues nor the Department of Justice address this regulatory mandate, much less offer any legal basis for disregarding it.  The Leagues belittle the Executive Director for deeming his responsibility to be ministerial, but they neglect to even address the federal rule supporting that understanding.  The Executive Director not only was permitted to grant the three States' request to modify the State-specific instructions, he was compelled to do so.[12]

### C.    The Executive Director's Decision was not Inconsistent with Procedural Requirements of the Statute or any EAC Procedure

The Leagues assert that the Executive Director acted contrary to a requirement that the EAC act on "policy" matters through a bipartisan consensus process.  Leagues Br. 31-33.  The Leagues fail to explain how the inclusion of proof-of-citizenship requirements in the Kansas-specific instructions constitutes "policy" and what "long-standing" policy the inclusion violated.

---

[12] Notably, the Tenth Circuit failed to address this issue in *EAC*, when it held that the EAC had the discretion to either grant or deny a State's requested modification to its State-specific instructions.  *See* 772 F.3d 1183.

While the statute requires "the approval of at least three" commissioners to carry out "[a]ny action which the Commission is authorized to carry out," 52 U.S.C. § 20928, this requirement does not preclude delegation of authority. "[S]ubdelegation to a subordinate federal officer… is presumptively permissible absent affirmative evidence of a contrary congressional intent." *U.S. Telecomm. Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004); *see also EAC*, 772 F.3d at 1190-91 (concluding that because the statute "provides for an Executive Director, a General Counsel, and other staff, …Congress contemplated some degree of subdelegation to those staff members").

Courts normally owe deference to an agency's interpretation of the statute it is charged with administering, even to the point of its interpretation of its own jurisdiction. *See City of Arlington*, 133 S. Ct. at 1870-71 (deference extends to an agency's interpretation of the scope of its own authority under a statute). Absent some indication in an agency's enabling statute that delegation is forbidden, delegation to subordinate personnel within the agency is generally permitted. *Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 121 (1947); *U.S. Telecom Ass'n*, 359 F.3d at 565 ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent.").

40

The Leagues fail to recognize that the EAC and its predecessor the FEC determined that state-specific instruction changes did not require the Commissioners' attention.  The Department of Justice, on the other hand, correctly points out that the FEC and the EAC have historically delegated administration of the State-specific instructions to the Executive Director.  DOJ Br. 7-9.  The most recent organizational management statement says nothing about responsibility for approving State-specific instruction changes and does not prohibit the Executive Director from making those decisions.

Historically, however, such decisions have been made by the Executive Diretor.  JA-997.  Indeed, when the FEC was in charge of the Federal Form, the FEC publicly announced the procedural steps necessary to modify the State-specific instructions.  The FEC announced that Commission approval would be necessary to modify the nationwide portions of the Federal Form, but modifications to the State-specific instruction would be made by the Office of Election Administration (now the Executive Director):

> On August 8, 2000, the Commission approved a procedural change that allows the OEA [Office of Election Administration] to make any changes to the National Mail Voter Registration Form *that are required by changes in state law*, and to notify the Commission of the revisions.  The OEA must submit for a formal Commission vote those changes to the form that are not specific to a given state.

MATERIAL UNDER SEAL DELETED

Federal Election Commission "Record" Vol. 28, No. 8 at 1 n.1 (August 2002)(emphasis added).[13]  In other words, the OEA professional staff would be permitted to approve all requests for modification of the *State-specific instructions* of the Federal Form *without a vote of the FEC Commissioners*.

---

[13] Available at http://www.fec.gov/pdf/record/2002/aug02.pdf.

Without an unequivocal statement in law or regulation that the Executive

Director may not decide changes in state-specific instructions, this court must

presume that the Executive Director's decision was regularly made. The EAC's

decision, absent clear evidence to the contrary, must be accorded a presumption of

regularity. *See*, *e.g*., *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C.

Cir. 2007)("The presumption of regularity supports the official acts of public

officers and, in the absence of clear evidence to the contrary, courts presume that

they have properly discharged their official duties."); *Sierra Club v. Costle*, 657

F.2d 298, 334 (D.C. Cir. 1981)(agencies receive "the benefit of the presumption of

good faith and regularity in agency action"). The Leagues have presented no

evidence or argument sufficient to overcome the presumption of regularity.

Moreover, the Executive Director's decision is due greater deference as to

the interpretation of the EAC's substantive regulations, interpretative regulations,

and policy unless that interpretation is plainly erroneous. *Auer v. Robbins*, 519

U.S. 452 (1997).[14] Under *Auer*, when an agency interprets "its own ambiguous

regulation[s]," courts will defer to that interpretation unless it is "plainly erroneous

or inconsistent with the regulation[s][,]" or there "is reason to suspect that the

---

[14] Even in litigation briefs submitted by the agency, the agency's interpretation is
subject to deference. This is not true of Justice Department interpretations of
agency regulations, particularly when the Department abandons the agency
interpretation.

43

agency's interpretation does not reflect the agency's fair and considered judgment

on the matter in question." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct.

2156, 2166 (2012)(internal quotation marks omitted).  Thus, "an agency's

interpretation need not be the only possible reading of a regulation—or even the

best one—to prevail." *Decker v. Nw. Environ. Def. Ctr.*, 133 S. Ct. 1326, 1337

(2013).  This Court has concluded that *Auer* provides for an even greater degree of

deference to the agency than *Chevron*.  *Consarc Corp. v. U.S. Treasury Dep't,

Office of Foreign Assets Control*, 71 F.3d 909, 915 (D.C. Cir. 1995)).

### D.     Notice and Comment Rulemaking on State-Specific Instructions Was Not Required

The Leagues argue that the EAC was required to make changes in the

Form's state-specific instructions through notice-and-comment rulemaking under

the APA.  5 U.S.C. § 553.  Leagues Br. 34-35.  The Leagues' argument simply has

no merit.  The Department of Justice also disagrees with the Leagues on this point.

DOJ Br. 21-22.

The EAC's process for developing the Federal Form has been characterized

by the Supreme Court as "entirely informal."   *ITCA*, 133 S. Ct. at 2260 n.10.

("Indeed, the whole request process appears to be entirely informal, Arizona's

prior request having been submitted by e-mail.").  The decision to alter the state-

specific instructions is accomplished through "informal adjudication." *EAC,* 772 F.3d at 1197.  Adjudication is the APA default; and an agency may, if Congress has delegated authority, choose to proceed by rulemaking.  However, informal adjudications do not require notice-and-comment procedures.  *See International Internship Program v. Napolitano*, 718 F.3d 986, 988 (D.C. Cir. 2013)("[N]otice-and-comment procedures" are not "trigger[ed]" when the agency action is an "informal adjudication.")(citations omitted).

Neither the EAC nor the FEC ever made such a choice.  The EAC has not published notices or solicited comments in the *Federal Register* in the process of deciding whether to grant a State's request to update its state-specific instructions on the Federal Form.  The single exception was one discretionary notice during the prior litigation, when the commissioner-less EAC was commandeered by the Department of Justice.  *See* EAC, *Notice and Request for Public Comment on State Requests To Include Additional Proof-of-Citizenship Instructions on the National Mail Voter Registration Form*, 78 Fed. Reg. 77,666 (December 24, 2013).  That Notice contained no regulatory words of issuance or codification, and the 10-day public comment period would have likely violated the APA advance notice and an opportunity for public comment requirements of fair notice of a proposed rule.  An agency is not obliged to issue more public notices merely because it did so once in the past.

The Leagues erroneously cite (multiple times) a notice of proposed rulemaking and an advance notice of proposed rulemaking by the EAC's predecessor FEC as authority for adoption of the form by rulemaking.  But they never cite a final rule, because no final rule was adopted.  Leagues Br. 35, *citing* FEC, *Nat'l Voter Registration Act of 1993*, 59 Fed. Reg. 11,211 (Mar. 10, 1994)(notice of proposed rulemaking); FEC, *Nat'l Voter Registration Act*, 58 Fed. Reg. 51,132 (Sept. 30, 1993)(advance notice of proposed rulemaking).  Neither was ever finalized; and no such proposal obligates an agency in the future.

### E.      The EAC's Course was Clear from its Decision

In his declaration, Executive Director Newby explained that he received a request from Kansas which contained "new information" related to noncitizens "register[ing] to vote" and, after consulting with the Commissioners and reviewing past agency practices, he "determin[ed] that the changes to the state-specific instructions were necessary…."  JA-292-294.  In the context of what the Supreme Court has described as an "entirely informal" process, that explanation was sufficient.  *See ITCA*, 133 S. Ct. at 2260 n.10.  Appellants' argument that this was insufficient explanation fails because the Executive Director's decision was clear from the entirety of the record and, separately, in light of his contemporaneous exposition.

First, this Court should "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007). In this case, Kansas presented evidence of noncitizens registering and made clear that the proof-of-citizenship requirement was designed to prevent such noncitizen registrations. JA-859, 862. Kansas also demonstrated that the requirement was reflected in Kansas law. The EAC's decision to change the Kansas-specific instructions to comport with Kansas law was reasonably discernable when it approved the change.

In an informal adjudication, the EAC is not required to cite every piece of evidence that it has considered and rationalize every possible interpretation. *See Menkes v. Dep't of Homeland Sec.*, 486 F.3d, 1307, 1314 (D.C. Cir. 2007)("Of course, this was an informal adjudication, and it is common for the record to be spare in such cases.")(citing *Camp v. Pitts*, 411 U.S. 138, 139-41 (1973)). Nor has it imposed such a requirement on itself by regulation. Most importantly, *none of the prior grants of state request in the history of the Federal Form were accompanied by any EAC explanation of its decision*. The Executive Director's memo goes well beyond the past practice of the agency, and the scope of the decision here comports with the scope of the issue presented.

Second, the Executive Director prepared a memorandum contemporaneous with his decision and the posting of the changes to the Kansas-specific instructions,

JA-788-794, that the Department of Justice agrees must be considered part of his

decision.  DOJ Br. 17-18.[15]  This contemporaneous statement explaining the

decision abundantly satisfies the APA in the context of an informal adjudication,

especially where no previous grant of a State request was ever accompanied by any

statement at all.  *See* 5 U.S.C. § 706(2), *Citizens to Preserve Overton Park, Inc. v.*

*Volpe*, 401 U.S. 402, 413-14 and n.30 (1971), *abrogation on other grounds*

*recognized by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Safe Extensions, Inc.*

*v. F.A.A.*, 509 F.3d 593, 604 (D.C. Cir. 2007)("[I]n an informal adjudication the

agency can provide the court with any evidence it had before it when it made its

decision."); *Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325, 337-39 (D.C. Cir.

1989).

    Mr. Newby stated that the request letter from the Kansas Secretary of State

included "new information that had not been provided to the EAC previously,

consisting of a spreadsheet of non-citizens who recently registered to vote in

Sedgwick County, Kansas."  JA-292.  He also explained that he began by

---

[15] The Leagues argue that this Memorandum was a *post hoc* rationalization.
Leagues Br. 38.  However, "[t]he *'post hoc rationalization'* rule is not a time
barrier which freezes an agency's exercise of its judgment after an initial decision
has been made and bars it from further articulation of its reasoning.  It is a rule
directed at reviewing courts which forbids judges to uphold agency action on the
basis of rationales offered by anyone other than the proper decisionmakers."
*Menkes v. U.S. Dept. of Homeland Sec.*, 637 F.3d 319, 337 (D.C. Cir.
2011)(quoting *Local 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v.*
*N.L.R.B.*, 546 F.2d 989, 992 (D.C. Cir. 1976)).

"evaluating previous requests and saw that requests in the past were not

consistently evaluated" and that "previous decisions regarding state-specific

instructions were evaluated without Commission-enacted policy" and that

"[c]onclusions in the most recent EAC past appeared to be drawn by emotion

regarding specific requests."  JA-293.

The Leagues claim this affidavit is not part of the administrative record.  The

Department of Justice disagrees.  DOJ Br. 18, n.3.  Instead, the Leagues want this

Court to focus on another contemporaneous document Mr. Newby drafted entitled

"Acceptance of State-Instructions to Federal Form for Alabama, Georgia, and

Kansas."  JA-788.  This is a document explaining how requests for modifications

to the state-specific instructions were being processed "as part of an outline of a

structured process that is being followed and will be followed going

forward."  *Id.*  In that document, Mr. Newby noted that a quorum of the EAC

Commissioners passed a "Roles and Responsibilities document" which requires

"the Executive Director to carry out policies set by the Commissioners."  JA-

789.  He explained that "State-specific instructional changes are ministerial, and,

thus, routine" and that the Executive Director reviews those for "clarity and

accuracy."  *Id.*  It is only when changes to the general instructions or the form itself

are required by a request does it reach Commissioner level approval.  *Id.*  Mr.

Newby followed these procedures "because there did not appear to be a structured

procedure that the EAC followed related to… requests to modify the form's instructions."  *Id.*

Mr. Newby also interpreted the Roles and Responsibilities document itself, which Appellants rely on to claim he was somehow precluded from making this decision.  JA-791.  Mr. Newby explained that "changes to the instructions consistent with state law do not" fall under the term "policy" as defined by the Commissioners.  *Id.*  He pointed out the long-established "ministerial duty" of the Executive Director in changing the State-specific instructions of the Federal Form, *Id.*, which was apparently only deviated from when Acting Executive Alice Miller denied Kansas's previous request because she was directed to do so by the Department of Justice.  JA-292.

Finally, Mr. Newby explained his decision regarding Kansas specifically.  He explained that he treated Kansas like the EAC treats other states— he looked at the state law and saw that "the Kansas registration is not complete without that state's requested documentation, spelled out in Kansas law."  JA-791.  He noted this was consistent with the way the EAC treated requests by Louisiana and Nevada.  *Id.*  He also noted other states where the Federal Form simply requires applicants to consult their state's election office for a complete explanation of the state's requirements.  *Id.* at 792.

The Leagues present two arguments in claiming that Mr. Newby acted beyond his authority.  First, the Leagues argue that Mr. Newby's decision is arbitrary because he required documentary proof of citizenship when the Congress allegedly "rejected" such a requirement.  LWV 39.  But, *ITCA* already *rejected* the Leagues' theory by indicating that Arizona could re-request a modification of the State-specific instructions of Federal Form to include documentary proof of citizenship.  133 S. Ct. at 2259-60.  If documentary proof of citizenship was prohibited by Congress, as the Leagues claim, then the Supreme Court would have said so, instead of encouraging the State to renew its request to the EAC.[16]  Moreover, the Department of Justice admits that this is the holding of *ITCA*.  DOJ Br. 2-3.

Second, the Leagues ask this Court to ignore the substance of the Newby memorandum and instead focus on one word, "irrelevant" and the fact that the memorandum does not use the term "necessary."  Leagues Br. 21.  In making their argument, the Leagues misconstrue *ITCA* as holding that "[u]nless the information

---

[16] Additionally, the League's reading of the legislative history is incorrect.  The referenced amendment was nothing more than a "rule of construction" making clear that the NVRA should not be interpreted to bar proof-of-citizenship laws.  H.R. Rep. No. 103-66, at 23 (1993)(Conf. Rep.).  It was deemed "not necessary" by the conference committee.  *Id.*  And Senate sponsor of the NVRA, Wendell Ford, who also sat on the conference committee, explained why it was not necessary:  "I say there is nothing in the bill now that would preclude the State's requiring presentation of documentary evidence of citizenship.  I think basically this is redundant…."  Page S2902, Congressional Record, March 16, 1993.

is 'necessary to enforce [the States' voter] qualifications,' the Federal Form must remain free of the State's procedural hurdles, as Congress intended." Leagues Br. 14. The Department of Justice similarly asks this Court to order the EAC to limit its review to Kansas's request to whether it is "necessary to enable the appropriate State election official to assess the eligibility." DOJ Br. 17.

There are two fatal flaws with this argument. First, it misstates the holding of *ITCA*. The Supreme Court framed the question as one of whether the *State* deems proof of citizenship necessary. "[A] State may request that the EAC alter the Federal Form to include information *the State deems necessary* to determine eligibility." *ITCA*, 133 S. Ct. at 2259 (emphasis added). And the *ITCA* Court specifically suggested that Arizona could renew its proof-of-citizenship request to the EAC. *Id.* at 2260. Nowhere did the Court suggest that the EAC should, or even could, engage in a subjective policy inquiry to decide whether a proof-of-citizenship requirement was desirable. *See Id.* at 2258-2260. Indeed the *ITCA* Court did not specifically discuss what criteria the EAC should use in informally adjudicating requests for modification of the State-specific instructions of the Federal Form. *See Id.*[17] Second, the argument ignores the remainder of 52 U.S.C.

---

[17] The *ITCA* Court noted that if a federal court were called on to review an EAC denial of a State's request, the State need only to show that a "mere oath would not suffice to effectuate its citizenship requirement[.]" *ITCA*, 133 S. Ct. 2260. This phrasing can refer to *either* half of 52 U.S.C. § 20505(b)(1). Mere oath may not

§ 20505(b)(1).  The subsection has a second half to it that neither the Department of Justice nor the Leagues attempt to construe—information may be "necessary to enable the appropriate State election official… to administer voter registration and other parts of the election process."  *Id.*  Whether the Leagues and the Department are correct in their interpretation of the first half of § 20505(b)(1) is "irrelevant" to Mr. Newby's actual decision here.  *See* JA-791.  Mr. Newby was focused on the second half of that subsection—something that the Tenth Circuit in *Kobach v. EAC* entirely overlooked in reaching its conclusion.[18]

In summary, Mr. Newby's explanation is consistent with the statute, consistent with 11 C.F.R. § 9428.4(b)(1), goes far beyond past (unexplained) grants of State requests, and deserving of *Chevron* deference.

### F.     There was no Prior "Policy" of EAC Opposition to Proof-of-Citizenship Requirements

The Leagues argue that the Executive Director failed to articulate a rationale for an alleged reversal of what the Leagues claim was "policy" or "precedent."

---

suffice "to assess the eligibility of the applicant," and mere oath may not suffice to "administer voter registration" laws of the State.  *Id.*

[18] In fact, nowhere in that entire decision is the statute even quoted, making the rationale behind the Tenth Circuit's decision unclear on that point.  *See EAC*, 772 F.3d 1183.

Leagues Br. 36-38.  The Leagues fail to acknowledge, however, that *never did a majority of the EAC commissioners ever adopt a "policy" opposing proof of citizenship*.  All that existed was a 2006 decision by an Executive Director declining Arizona's request and a 2-2 deadlock of the Commissioners when Arizona appealed to the EAC.  Neither of these actions constitutes the formal establishment of an EAC policy; and the 2-2 deadlock meant that "no action could be taken," not that any policy of rejecting proof-of-citizenship requirements was established.  *ITCA*, 133 S. Ct. 2260 (citing 52 U.S.C. § 20928).  With respect to the January 2014 memorandum denying Kansas's and Arizona's requested instructions, there were no EAC commissioners at the time; and there was no Executive Director.  As Acting Executive Director Alice Miller told Mr. Newby, "the Department of Justice issued the opinion."  JA-292.  It cannot be said to constitute an EAC *policy* in any meaningful sense.

To the extent that the Leagues claim these informal adjudications constituted some sort of "precedent" rather than formal policy, there are three flaws with this claim.  First, the EAC never published the prior decisions and designated them as "precedent decisions."  Second, Kansas's presentation of new facts proving that numerous noncitizens were registering or attempting to register (including by using the Federal Form) changed the factual landscape.  JA-292.  A different decision is entirely appropriate under such circumstances.  *See Local 777, Democratic Union*

*Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. N.L.R.B.*, 603 F.2d 862, 870 (D.C. Cir. 1978)(" new fact" can warrant agency "conclusion that its earlier decision is not a binding precedent") *opinion adhered to on denial of reh'g*, (D.C. Cir. June 20, 1979); *Seven Star, Inc. v. United States*, 873 F.2d 225, 227 (9th Cir. 1989)("a decision by an administrative agency in one case does not mandate the same result in every similar case in succeeding years"); *Third Nat. Bank v. Stone*, 174 U.S. 432, 432-34 (1899). Third, Kansas's requested instructions in 2015 were different, giving applicants much more information about how to complete their applications and comply with Kansas law. *See* JA-791 (explaining that Kansas's newly requested instructions were "more clear to applicants than instructions in other states."). Furthermore, assuming *arguendo* that the previous denials could somehow be construed as official precedent decisions of the agency, Mr. Newby's explanations in his declaration to the district court and his February 1, 2016, memoranda adequately explain his reasons for departing from a precedent decision. *See* JA-292 (that this request "included new information"), 293 (explaining his understanding that previous conclusions were "drawn by emotion,"), 791 (that it was consistent with EAC responses to other State requests).

## IV.     The Leagues Fail to Establish that the Equities or Public Interest Favor an Affirmative Preliminary Injunction

A plaintiff must show that a preliminary injunction would "not substantially injure other interested parties." *Chaplaincy for Full Gospel Churches*, 454 F.3d at 297. Here, not only does plaintiff seek an affirmative injunction against an agency of the United States but also against three States, and any potential harm to them must likewise by weighed.

As explained above, there is no irreparable harm whatsoever that the Leagues suffer. They will be printing and distributing voter education materials regardless of the outcome of this case. All that would change is the content. In contrast, the State has numerous, significant interests in maintaining the status quo and in preserving the current wording of the Kansas-specific instructions of the Federal Form—wording that is consistent with Kansas's proof-of-citizenship law. The State asserts four specific interests.

First, the State would face severe and expensive administrative burdens if a preliminary injunction were to be issued. Kansas has been operating under the revised instructions of the Federal Form since February 1, 2016. Kansas has accepted 62,992 applications to register to vote from that date to the present, of which 11,655 were mail-in applications that *may* have been on a Federal Form.[19]

---

[19] As calculated by the State of Kansas ELVIS database on August 1, 2016. The 11,655 applications includes subcategories of applications denoted as follows: 6,554 applications by mail, 3,953 applications from voter registration drives, 5 applications from armed forces recruitment offices, and 1,143 applications from

Personnel in Kansas's 105 counties would have to individually examine each of those 11,655 records to determine which involved a Federal Form, manually change the status of those records, and contact those applicants by mail.  This would be exceedingly burdensome.

Second, as Kansas demonstrated to the EAC in its request for modification of the state-specific instructions of the Federal Form, registration by non-citizens is a significant problem.  The State submitted a spreadsheet of such cases in support of the November 17, 2015, request to the EAC.  The spreadsheet illustrated eighteen instances of noncitizen registration cases in a Sedgwick County alone. JA-862-863.  That number has since grown to 25; and it reflects only a portion of the noncitizens on that county's voter rolls—those who came to the attention of the county election office because they subsequently naturalized or because they confessed to being noncitizens.  If all of Kansas's 105 counties are considered, the total number of noncitizens who have registered or attempted to registered is likely to be in the hundreds, if not thousands.[20]  Kansas has an overwhelming interest in ensuring the integrity of its electoral processes and preventing fraud in the form of non-citizens registering and/or voting.  "It is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal." *Rosario v.*

---

"all other means" (not including Department of Vehicles, in person, and online applications).

[20] Only Sedgwick County has systematically tracked this information.

*Rockefeller*, 410 U.S. 752, 759 (1973).   It is not necessary for a State to show past examples of fraud to justify a state law protecting the integrity of the electoral process, *see Crawford v. Marion County*, 553 U.S. 181, 195-197 (2008), but Kansas had done so.  The problem of noncitizens registering and effectively cancelling out the votes of citizens is a significant one in Kansas.

Third, as a sovereign State, Kansas has a significant interest in the preservation and enforcement of its laws.  *See Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 134 S. Ct. 506, 507 (2013)(state has "interest in enforcing a valid law").  If a preliminary injunction were issued, Kansas law would be defeated by the creation of a loophole for applicants who use the Federal Form and thereby evade the proof-of-citizenship requirement.

Fourth, the State has an interest in ensuring Kansas voters are not confused. It would be extremely confusing to voters if the Kansas-specific instructions on the Federal Form were to yo-yo back and forth in response to the demands of the Leagues.  Modifications have been made to the state-specific instructions over the years, but *never has a modification been reversed*.  This would be an unprecedented and confusing development.  For all of these reasons, the interests of the State outweigh any interests asserted by the Leagues; and the public interest weighs against issuance of a preliminary injunction.

Finally the Leagues argue that "By definition, 'the public interest favors permitting as many qualified voters to vote as possible.'"  League Br. 58 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014))(alterations omitted).  The Leagues then conveniently ignore the critical qualifier that the public interest lies in permitting as many *qualified voters* to vote as possible.  Kansas's request and the Executive Director's decision assure that potential voters are in fact qualified, and thereby protect the value of the votes of all qualified voters.  The Leagues may disagree with this value of the public interest, but it is the State of Kansas that must make that valuation.

## V.    <u>Remand Would be the Appropriate Remedy if the Court Finds That the District Court Abused Its Discretion</u>

Finally, the Department of Justice argues not only that Executive Director failed to undertake the statutorily required "necessary" finding but also that the Leagues are somehow thereby entitled to injunctive relief.  DOJ Br. 16-22.  Moreover, the Department of Justice argues that this Court should affirmatively resolve all of the Leagues' claims.  *Id.* at 22-23.

The Department of Justice confuses the nature of the proceedings before this Court.  The Leagues sought review here of a denial of a mandatory preliminary injunction, not a decision on the merits.  Even if this Court were to agree on a

59

singular point that the Leagues have established irreparable harm or are likely to succeed on the merits, the proper remedy is a remand to the district court to decide all other elements for a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 305.

Even if this Court were to agree with the Leagues that the EAC Executive Director erred in not conducting the proper analysis, this Court should not substitute its judgment for that of the agency. This Court has consistently held that it retains discretion even when the APA provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see Overton Park*, 401 U.S. at 413-14. "The decision whether to vacate depends on the seriousness of the order's deficiencies… and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)(internal quotation marks omitted).

This Court frequently remands without vacatur where there is a likelihood of a cure of the defect in the decision on remand and a substantial disruptive effect that would result from vacatur. See *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197-98 (D.C. Cir. 2009); *United States Sugar Corp. v. EPA*, D.C. Cir. No. 11-1108 (July 29, 2016), at 77, 131, 132 (remanding rule without vacatur to

60

the EPA to adequately explain how carbon monoxide acts as a reasonable surrogate for non-dioxin/furan organic hazardous air pollutants, to explain its decision to exclude synthetic boilers from permitting requirements, and to explain why one set of standards is applicable rather than another).  This Court has also remanded without vacatur even when the agency acted without statutory authority. *See Michigan v. EPA*, 576 U.S. ___ (Nos. 14-46, 14-47, and 14-49, June 29, 2015), on remand *White Stallion Energy Center LLC. v. EPA*, D.C. Cir. No. 12-1100 (Dec. 15, 2015)(remand to EPA to make "appropriate and necessary" finding prior to undertaking rulemaking, without vacating rulemaking promulgated without finding).

The Department of Justice seeks to substitute its judgment for that of the EAC's Executive Director and seeks to have this Court adopt its view in contravention of basic principles of deference in administrative law.  This Court should not adopt the Department of Justice's unfettered decision making.

## CONCLUSION

For all of these reasons, the decision of the district court should be affirmed.

Respectfully submitted this 3rd day
of August, 2016.

*/s/ Kris Kobach*\*
KRIS W. KOBACH, Secretary of State
Kansas Bar No. 17280

61

*D.C. Circuit Admission pending

/s/ Garrett Roe
GARRETT ROE
D.C. Circuit Bar No. 55423
Kansas Bar No. 26867
Office of the Kansas Secretary of State
120 SW 10th Avenue,
Topeka, Kansas  66612
Tel. (785) 296-4575
Fax. (785) 368-8032
Kris.kobach@ks.gov
Garrett.roe@ks.gov

**_Attorneys for Intervenor-Appellee_**

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 13,862 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). The State contacted the Office of the Clerk of the Court and confirmed that the State is deemed an "Appellee" in this appeal and that the appropriate word limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) applies.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Word 2010 in 14-point Times New Roman font.

Date:  August 3, 2016

*/s/ Garrett Roe*
GARRETT ROE
OFFICE OF THE KANSAS SECRETARY OF STATE
120 SW 10th Ave, Memorial Hall, First Floor
Topeka, KS  66612
Ph: 785-296-8473
Fax: 785-368-8032
Garrett.roe@ks.gov
***Attorneys for Intervenor Kansas Secretary of State***

*Admission sought

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2016, I electronically filed an original and eight (8) copies the foregoing Brief for Appellee-Intervenor Secretary of State of Kansas Public Copy – Sealed Material Deleted with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

I further certify that on August 3, 2016, I caused two (2) copies of the foregoing to be hand delivered to the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit.

*/s/ Garrett Roe*
GARRETT ROE
OFFICE OF THE KANSAS SECRETARY OF STATE
120 SW 10th Ave, Memorial Hall, First Floor
Topeka, KS  66612
Ph: 785-296-8473
Fax: 785-368-8032
Garrett.roe@ks.gov
***Attorney for Intervenor Kansas Secretary of State***

# ADDENDUM

# TABLE OF CONTENTS

8 U.S.C. § 20502 ...................................................................................1

8 U.S.C. § 20503 ...................................................................................1

8 U.S.C. § 20505 ...................................................................................2

8 U.S.C. § 20507 ...................................................................................3

8 U.S.C. § 20508 ...................................................................................4

11 C.F.R. § 9428.3 ................................................................................5

11 C.F.R. § 9428.4 ................................................................................5

11 C.F.R. § 9428.6 ................................................................................7

K.S.A. § 25-2309 ..................................................................................8

## The National Voter Registration Act of 1993 (excerpts)

### 52 U.S.C. § 20502. Definitions

As used in this chapter--

(1) the term "election" has the meaning stated in section 30101(1) of this title;

(2) the term "Federal office" has the meaning stated in section 30101(3) of this title;

(3) the term "motor vehicle driver's license" includes any personal identification document issued by a State motor vehicle authority;

(4) the term "State" means a State of the United States and the District of Columbia; and

(5) the term "voter registration agency" means an office designated under section 20506(a)(1) of this title to perform voter registration activities.

### 52 U.S.C. § 20503. National procedures for voter registration for elections for Federal office

(a) In general. Except as provided in subsection (b), notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office--

(1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 20504 of this title;

(2) by mail application pursuant to section 20505 of this title; and

(3) by application in person--

(A) at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and

(B) at a Federal, State, or nongovernmental office designated under section 20506 of this title.

(b) Nonapplicability to certain States. This chapter does not apply to a State described in either or both of the following paragraphs:

(1) A State in which, under law that is in effect continuously on and after August 1, 1994, there is no voter registration requirement for any voter in the State with respect to an election for Federal office.

(2) A State in which, under law that is in effect continuously on and after August 1, 1994, or that was enacted on or prior to August 1, 1994, and by its terms is to come into effect upon the enactment of this chapter, so long as that law

**Kansas Secretary of State Kris Kobach Addendum Page 1**

remains in effect, all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office.

## 52 U.S.C. § 20505. Mail registration

(a) Form.

(1) Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 20508(a)(2) of this title for the registration of voters in elections for Federal office.

(2) In addition to accepting and using the form described in paragraph (1), a State may develop and use a mail voter registration form that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections for Federal office.

(3) A form described in paragraph (1) or (2) shall be accepted and used for notification of a registrant's change of address.

(b) Availability of forms. The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs.

(c) First-time voters.

(1) Subject to paragraph (2), a State may by law require a person to vote in person if--

(A) the person was registered to vote in a jurisdiction by mail; and

(B) the person has not previously voted in that jurisdiction.

(2) Paragraph (1) does not apply in the case of a person--

(A) who is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act;

(B) who is provided the right to vote otherwise than in person under section 20102(b)(2)(B)(ii) of this title; or

(C) who is entitled to vote otherwise than in person under any other Federal law.

(d) Undelivered notices. If a notice of the disposition of a mail voter registration application under section 20507(a)(2) of this title is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 20507(d) of this title.

## 52 U.S.C. § 20507. Requirements with respect to administration of voter registration

(a) In general.

In the administration of voter registration for elections for Federal office, each State shall--

(1) ensure that any eligible applicant is registered to vote in an election--

(A) in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B) in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(2) require the appropriate State election official to send notice to each applicant of the disposition of the application;

(3) provide that the name of a registrant may not be removed from the official list of eligible voters except--

(A) at the request of the registrant;

(B) as provided by State law, by reason of criminal conviction or mental incapacity; or

(C) as provided under paragraph (4);

(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--

(A) the death of the registrant; or

(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

(5) inform applicants under sections 20504, 20505, and 20506 of this title of--

(A) voter eligibility requirements; and

**Kansas Secretary of State Kris Kobach Addendum Page 3**

(B) penalties provided by law for submission of a false voter registration application; and

(6) ensure that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.

## 52 U.S.C. § 20508. Federal coordination and regulations

(a) In general. The Election Assistance Commission--

(1) in consultation with the chief election officers of the States, shall prescribe such regulations as are necessary to carry out paragraphs (2) and (3);

(2) in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office;

(3) not later than June 30 of each odd-numbered year, shall submit to the Congress a report assessing the impact of this chapter on the administration of elections for Federal office during the preceding 2-year period and including recommendations for improvements in Federal and State procedures, forms, and other matters affected by this chapter; and

(4) shall provide information to the States with respect to the responsibilities of the States under this chapter.

(b) Contents of mail voter registration form. The mail voter registration form developed under subsection (a)(2)--

(1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2) shall include a statement that--

(A) specifies each eligibility requirement (including citizenship);

(B) contains an attestation that the applicant meets each such requirement; and

(C) requires the signature of the applicant, under penalty of perjury;

(3) may not include any requirement for notarization or other formal authentication; and

(4) shall include, in print that is identical to that used in the attestation portion of the application--

(i) the information required in section 20507(a)(5)(A) and (B) of this title;

(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

## Code of Federal Regulations (excerpts)

## 11 C.F.R. § 9428.3. General information.

(a) The national mail voter registration form shall consist of three components: An application, which shall contain appropriate fields for the applicant to provide all of the information required or requested under 11 CFR 9428.4; general instructions for completing the application; and accompanying state-specific instructions.

(b) The state-specific instructions shall contain the following information for each state, arranged by state: the address where the application should be mailed and information regarding the state's specific voter eligibility and registration requirements.

(c) States shall accept, use, and make available the form described in this section.

## 11 C.F.R. § 9428.4. Contents.

(a) Information about the applicant.
The application shall provide appropriate fields for the applicant's:

(1) Last, first, and middle name, any suffix, and (optional) any prefix;

(2) Address where the applicant lives including: street number and street name, or rural route with a box number; apartment or unit number; city, town, or village name; state; and zip code; with instructions to draw a locational map if the applicant lives in a rural district or has a non-traditional residence, and directions not to use a post office box or rural route without a box number;

(3) Mailing address if different from the address where the applicant lives, such as a post office box, rural route without a box number, or other street address; city, town, or village name; state; and zip code;

(4) Month, day, and year of birth;

(5) Telephone number (optional); and

**Kansas Secretary of State Kris Kobach Addendum Page 5**

(6) Voter identification number as required or requested by the applicant's state of residence for election administration purposes.

(i) The application shall direct the applicant to consult the accompanying state-specific instructions to determine what type of voter identification number, if any, is required or requested by the applicant's state.

(ii) For each state that requires the applicant's full social security number as its voter identification number, the state's Privacy Act notice required at 11 CFR 9428.6(c) shall be reprinted with the instructions for that state.

(7) Political party preference, for an applicant in a closed primary state.

(i) The application shall direct the applicant to consult the accompanying state-specific instructions to determine if the applicant's state is a closed primary state.

(ii) The accompanying instructions shall state that if the applicant is registering in a state that requires the declaration of party affiliation, then failure to indicate a political party preference, indicating "none", or selecting a party that is not recognized under state law may prevent the applicant from voting in partisan races in primary elections and participating in political party caucuses or conventions, but will not bar an applicant from voting in other elections.

(8) Race/ethnicity, if applicable for the applicant's state of residence. The application shall direct the applicant to consult the state-specific instructions to determine whether race/ethnicity is required or requested by the applicant's state.


(b) Additional information required by the Act. (42 U.S.C. 1973gg–7(b)(2) and (4)).[1]
The form shall also:

(1) Specify each eligibility requirement (including citizenship). The application shall list U.S. Citizenship as a universal eligibility requirement and include a statement that incorporates by reference each state's specific additional eligibility requirements (including any special pledges) as set forth in the accompanying state instructions;

(2) Contain an attestation on the application that the applicant, to the best of his or her knowledge and belief, meets each of his or her state's specific eligibility requirements;

(3) Provide a field on the application for the signature of the applicant, under penalty of perjury, and the date of the applicant's signature;

(4) Inform an applicant on the application of the penalties provided by law for submitting a false voter registration application;

---

[1] So in original; probably should read "52 U.S.C. 20508(b)(2) and (4)"

**Kansas Secretary of State Kris Kobach Addendum Page 6**

(5) Provide a field on the application for the name, address, and (optional) telephone number of the person who assisted the applicant in completing the form if the applicant is unable to sign the application without assistance;

(6) State that if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(7) State that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

(c) Other information. The form will, if appropriate, require an applicant's former address or former name or request a drawing of the area where the applicant lives in relation to local landmarks.

## 11 C.F.R. § 9428.6 Chief state election official.

(a) Each chief state election official shall certify to the Commission within 30 days after July 25, 1994:

(1) All voter registration eligibility requirements of that state and their corresponding state constitution or statutory citations, including but not limited to the specific state requirements, if any, relating to minimum age, length of residence, reasons to disenfranchise such as criminal conviction or mental incompetence, and whether the state is a closed primary state.

(2) Any voter identification number that the state requires or requests; and

(3) Whether the state requires or requests a declaration of race/ethnicity;

(4) The state's deadline for accepting voter registration applications; and

(5) The state election office address where the application shall be mailed.

(b) If a state, in accordance with 11 CFR 9428.4(a)(2), requires the applicant's full social security number, the chief state election official shall provide the Commission with the text of the state's privacy statement required under the Privacy Act of 1974 (5 U.S.C. 552a note).

(c) Each chief state election official shall notify the Commission, in writing, within 30 days of any change to the state's voter eligibility requirements or other information reported under this section.

**K.S.A. § 25-2309. Application for registration; registration agencies; limitations on public inspection of registrations; registration citizenship requirements; election board citizenship hearings; unsatisfactory evidence of citizenship; sworn affidavits; rules and regulations**

(a) Any person may apply in person, by mail, through a voter registration agency, or by other delivery to a county election officer to be registered. Such application shall be made on: (1) A form approved by the secretary of state, which shall be provided by a county election officer or chief state election official upon request in person, by telephone or in writing; or (2) the national mail voter registration form issued pursuant to federal law. Such application shall be signed by the applicant under penalty of perjury and shall contain the original signature of the applicant or the computerized, electronic or digitized transmitted signature of the applicant. A signature may be made by mark, initials, typewriter, print, stamp, symbol or any other manner if by placing the signature on the document the person intends the signature to be binding. A signature may be made by another person at the voter's direction if the signature reflects such voter's intention.

(b) Applications made under this section shall give voter eligibility requirements and such information as is necessary to prevent duplicative voter registrations and enable the relevant election officer to assess the eligibility of the applicant and to administer voter registration, including, but not limited to, the following data to be kept by the relevant election officer as provided by law:
　　(1) Name;
　　(2) place of residence, including specific address or location, and mailing address if the residence address is not a permissible postal address;
　　(3) date of birth;
　　(4) sex;
　　(5) the last four digits of the person's social security number or the person's full driver's license or nondriver's identification card number;
　　(6) telephone number, if available;
　　(7) naturalization data (if applicable);
　　(8) if applicant has previously registered or voted elsewhere, residence at time of last registration or voting;
　　(9) when present residence established;
　　(10) name under which applicant last registered or voted, if different from present name;
　　(11) an attestation that the applicant meets each eligibility requirement;
　　(12) a statement that the penalty for submission of a false voter registration application is a maximum presumptive sentence of 17 months in prison;

(13) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes;

(14) a statement that if an applicant does register to vote, the office to which a voter registration application is submitted will remain confidential and will be used only for voter registration purposes;

(15) boxes for the applicant to check to indicate whether the applicant is or is not a citizen of the United States, together with the question "Are you a citizen of the United States of America?";

(16) boxes for the county election officer or chief state election official to check to indicate whether the applicant has provided with the application the information necessary to assess the eligibility of the applicant, including such applicant's United States citizenship;

(17) boxes for the applicant to check to indicate whether or not the applicant will be 18 years of age or older on election day, together with the question "Will you be 18 years of age on or before election day?";

(18) in reference to paragraphs (15) and (17) the statement "If you checked 'no' in response to either of these questions, do not complete this form.";

(19) a statement that the applicant shall be required to provide identification when voting; and

(20) political party affiliation declaration, if any. An applicant's failure to make a declaration will result in the applicant being registered as an unaffiliated voter.

If the application discloses any previous registration in any other county or state, as indicated by paragraph (8) or (10), or otherwise, the county election officer shall upon the registration of the applicant, give notice to the election official of the place of former registration, notifying such official of applicant's present residence and registration, and authorizing cancellation of such former registration. This section shall be interpreted and applied in accordance with federal law. No eligible applicant whose qualifications have been assessed shall be denied registration.

(c) Any person who applies for registration through a voter registration agency shall be provided with, in addition to the application under subsection (b), a form which includes:

(1) The question "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

(2) a statement that if the applicant declines to register to vote, this decision will remain confidential and be used only for voter registration purposes;

**Kansas Secretary of State Kris Kobach Addendum Page 9**

(3) a statement that if the applicant does register to vote, information regarding the office to which the application was submitted will remain confidential and be used only for voter registration purposes; and

(4) if the agency provides public assistance,

(i) the statement "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

(ii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote, together with the statement "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

(iii) the statement "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

(iv) the statement "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with the Kansas Secretary of State."

(d) If any person, in writing, declines to register to vote, the voter registration agency shall maintain the form prescribed by subsection (c).

(e) A voter registration agency shall transmit the completed registration application to the county election officer not later than five days after the date of acceptance. Upon receipt of an application for registration, the county election officer shall send, by nonforwardable mail, a notice of disposition of the application to the applicant at the postal delivery address shown on the application. If a notice of disposition is returned as undeliverable, a confirmation mailing prescribed by K.S.A. 25-2316c, and amendments thereto, shall occur.

(f) If an application is received while registration is closed, such application shall be considered to have been received on the next following day during which registration is open.

(g) A person who completes an application for voter registration shall be considered a registered voter when the county election officer adds the applicant's name to the county voter registration list.

**Kansas Secretary of State Kris Kobach Addendum Page 10**

(h) Any registered voter whose residence address is not a permissible postal delivery address shall designate a postal address for registration records. When a county election officer has reason to believe that a voter's registration residence is not a permissible postal delivery address, the county election officer shall attempt to determine a proper mailing address for the voter.

(i) Any registered voter may request that such person's residence address be concealed from public inspection on the voter registration list and on the original voter registration application form. Such request shall be made in writing to the county election officer, and shall specify a clearly unwarranted invasion of personal privacy or a threat to the voter's safety. Upon receipt of such a request, the county election officer shall take appropriate steps to ensure that such person's residence address is not publicly disclosed. Nothing in this subsection shall be construed as requiring or authorizing the secretary of state to include on the voter registration application form a space or other provision on the form that would allow the applicant to request that such applicant's residence address be concealed from public inspection.

(j) No application for voter registration shall be made available for public inspection or copying unless the information required by paragraph (5) of subsection (b) has been removed or otherwise rendered unreadable.

(k) If an applicant fails to answer the question prescribed in paragraph (15) of subsection (b), the county election officer shall send the application to the applicant at the postal delivery address given on the application, by nonforwardable mail, with a notice of incompleteness. The notice shall specify a period of time during which the applicant may complete the application in accordance with K.S.A. 25-2311, and amendments thereto, and be eligible to vote in the next election.

(l) The county election officer or secretary of state's office shall accept any completed application for registration, but an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship. Evidence of United States citizenship as required in this section will be satisfied by presenting one of the documents listed in paragraphs (1) through (13) of subsection (l) in person at the time of filing the application for registration or by including a photocopy of one of the following documents with a mailed registration application. After a person has submitted satisfactory evidence of citizenship, the county election officer shall indicate this information in the person's permanent

voter file. Evidence of United States citizenship shall be satisfied by providing one of the following, or a legible photocopy of one of the following documents:

(1) The applicant's driver's license or nondriver's identification card issued by the division of vehicles or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver's license or nondriver's identification card that the person has provided satisfactory proof of United States citizenship;

(2) the applicant's birth certificate that verifies United States citizenship to the satisfaction of the county election officer or secretary of state;

(3) pertinent pages of the applicant's United States valid or expired passport identifying the applicant and the applicant's passport number, or presentation to the county election officer of the applicant's United States passport;

(4) the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States bureau of citizenship and immigration services by the county election officer or the secretary of state, pursuant to 8 U.S.C. § 1373(c);

(5) other documents or methods of proof of United States citizenship issued by the federal government pursuant to the immigration and nationality act of 1952, and amendments thereto;

(6) the applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number;

(7) the applicant's consular report of birth abroad of a citizen of the United States of America;

(8) the applicant's certificate of citizenship issued by the United States citizenship and immigration services;

(9) the applicant's certification of report of birth issued by the United States department of state;

(10) the applicant's American Indian card, with KIC classification, issued by the United States department of homeland security;

(11) the applicant's final adoption decree showing the applicant's name and United States birthplace;

(12) the applicant's official United States military record of service showing the applicant's place of birth in the United States; or

(13) an extract from a United States hospital record of birth created at the time of the applicant's birth indicating the applicant's place of birth in the United States.

**Kansas Secretary of State Kris Kobach Addendum Page 12**

(m) If an applicant is a United States citizen but does not have any of the documentation listed in this section as satisfactory evidence of United States citizenship, such applicant may submit any evidence that such applicant believes demonstrates the applicant's United States citizenship.

(1) Any applicant seeking an assessment of evidence under this subsection may directly contact the elections division of the secretary of state by submitting a voter registration application or form as described by this section and any supporting evidence of United States citizenship. Upon receipt of this information, the secretary of state shall notify the state election board, as established under K.S.A. 25-2203, and amendments thereto, that such application is pending.

(2) The state election board shall give the applicant an opportunity for a hearing and an opportunity to present any additional evidence to the state election board. Notice of such hearing shall be given to the applicant at least five days prior to the hearing date. An applicant shall have the opportunity to be represented by counsel at such hearing.

(3) The state election board shall assess the evidence provided by the applicant to determine whether the applicant has provided satisfactory evidence of United States citizenship. A decision of the state election board shall be determined by a majority vote of the election board.

(4) If an applicant submits an application and any supporting evidence prior to the close of registration for an election cycle, a determination by the state election board shall be issued at least five days before such election date.

(5) If the state election board finds that the evidence presented by such applicant constitutes satisfactory evidence of United States citizenship, such applicant will have met the requirements under this section to provide satisfactory evidence of United States citizenship.

(6) If the state election board finds that the evidence presented by an applicant does not constitute satisfactory evidence of United States citizenship, such applicant shall have the right to appeal such determination by the state election board by instituting an action under 8 U.S.C. § 1503. Any negative assessment of an applicant's eligibility by the state election board shall be reversed if the applicant obtains a declaratory judgment pursuant to 8 U.S.C. § 1503, demonstrating that such applicant is a national of the United States.

(n) Any person who is registered in this state on the effective date of this amendment to this section is deemed to have provided satisfactory evidence of citizenship and shall not be required to resubmit evidence of citizenship.

(o) For purposes of this section, proof of voter registration from another state is not satisfactory evidence of United States citizenship.

**Kansas Secretary of State Kris Kobach Addendum Page 13**

(p) A registered Kansas voter who moves from one residence to another within the state of Kansas or who modifies such voter's registration records for any other reason shall not be required to submit evidence of United States citizenship.

(q) If evidence of citizenship is deemed to be unsatisfactory due to an inconsistency between the document submitted as evidence and the name or sex provided on the application for registration, such applicant may sign an affidavit:

(1) Stating the inconsistency or inconsistencies related to the name or sex, and the reason therefor; and

(2) swearing under oath that, despite the inconsistency, the applicant is the individual reflected in the document provided as evidence of citizenship. However, there shall be no inconsistency between the date of birth on the document provided as evidence of citizenship and the date of birth provided on the application for registration. If such an affidavit is submitted by the applicant, the county election officer or secretary of state shall assess the eligibility of the applicant without regard to any inconsistency stated in the affidavit.

(r) All documents submitted as evidence of citizenship shall be kept confidential by the county election officer or the secretary of state and maintained as provided by Kansas record retention laws. The provisions of this subsection shall expire on July 1, 2016, unless the legislature reviews and reenacts this provision pursuant to K.S.A. 45-229, and amendments thereto, prior to July 1, 2016.

(s) The secretary of state may adopt rules and regulations to1 in order to implement the provisions of this section.

(t) Nothing in this section shall prohibit an applicant from providing, or the secretary of state or county election officer from obtaining satisfactory evidence of United States citizenship, as described in subsection (1), at a different time or in a different manner than an application for registration is provided, as long as the applicant's eligibility can be adequately assessed by the secretary of state or county election officer as required by this section.

(u) The proof of citizenship requirements of this section shall not become effective until January 1, 2013.

**Kansas Secretary of State Kris Kobach Addendum Page 14**